Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

been too trivial to call for a re-commitment of the report. We therefore overrule these exceptions.

The error, if any, covered by the other exceptions, regards a question of fact, and, not being manifest on the face of the report, will, we think, be more properly corrected by an appeal to the jury, than by a re-commitment of the report.

Moreover, the exceptions are not supported by affidavit, and for that reason, inasmuch as they rest, in part, at least, on facts which are not disclosed by the record, they cannot be sustained.

*Exceptions overruled.*

MOSES B. LOCKWOOD and others, Trustees, *v.* MECHANICS NATIONAL BANK.

SAME *v.* ROGER WILLIAMS NATIONAL BANK.

SAME *v.* COMMERCIAL NATIONAL BANK.

SAME *v.* NATIONAL BANK OF COMMERCE.

SAME *v.* AMERICAN NATIONAL BANK.

A power to make by-laws to regulate the management of the business of an association is sufficient to justify a by-law creating a lien on the stock.

A power to regulate the transfer, or manner of transferring stock is sufficient to authorize a by-law creating such a lien.

A power to regulate the transfer or manner of transferring stock is sufficient to authorize a by-law that stock shall be transferred only at the bank or on the books ; and in that case, until such transfer, the purchaser could take only an equitable title, subject to any claims of the corporation by charter, or by-law, or valid usage or agreement.

A National Bank has the power, under the National Currency Act of Congress of 1864, chap. 106, 1st session, 38th Congress, to make by-laws providing that the shares of its capital stock shall be transferable only on its books, that no stockholder shall be allowed to sell or transfer his stock while indebted to the bank, without the assent of its directors; and that the stock of any stockholder shall be held pledged and liable for the payment of any debt due or owing from such stockholder, and may be sold at public auction for the satisfaction of such debt, on default of payment thereof.

Lockwood and others, trustees, v. Mechanics National Bank, &c.

A by-law informally adopted may be subsequently ratified, or, without any record of adoption, may be proved by the usage and acts of the corporation and parties dealing with it.

Where no qualification is required and there is no usage to control, a person who is elected a bank director is presumed to accept the office unless he declines it.

This presumption may be rebutted. Whether simple non-action as a director, for five months, would be ordinarily sufficient to rebut it—*query*. But where the stockholders of a bank, in an instrument authorizing its conversion from a State to a National Bank, named all the directors who had been elected at the last annual election as those " who are now the directors of said bank," the court cannot hold that two of those so named were not directors at the time of such conversion, because they had never acted in that capacity since their election five months previously.

By the provisions of section 44 of the National Currency Act of 1864, (Chapter 106, 1st session 38th Congress,) upon the conversion of a State to a National Bank, all the directors of the former become those of the latter, until an election or appointment by the National Bank. *Semble*, that no oath is required from these *ad interim* directors, the oath prescribed by section 9 of the aforesaid act being designed for those regularly elected by the National Bank, but, assuming its necessity, a majority of those who were the directors of the State Bank before its conversion is necessary to make a quorum of the board of the National Bank.

In all cases where an act is to be done by a corporate body or a part of a corporate body and the number is definite, a majority of the whole number is necessary to constitute a legal meeting, although at a legal meeting, where a quorum is present, a majority of those present may act.

Hence, a by-law adopted at a meeting of six *ad interim* directors of a National Bank, which had twelve directors before its conversion, is invalid, because not adopted by a majority or quorum of the board.

THESE were five actions of the case brought to recover damages of the defendants for their refusing to permit transfers to be made on their books, to the plaintiffs, of certain shares of their capital stock standing in the name of Resolved Waterman, and by him assigned to the plaintiffs.

Jury trials having been waived, the five actions were tried together, and were argued to the court upon agreed statements of facts. From these statements, it appeared that the defendant corporations were national banking associations, organized under the act of Congress, entitled "An act to provide a National Currency, secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof," approved June 3d, 1864, and formed by the conversion into such national banking associations of state banks of the state of Rhode Island, pursuant to section 44 of said act, and the provisions of

chapter 535 of the statutes of this state, and that said state banks
were corporations organized under charters of the state of Rhode
Island.   That before and at the time of such conversion of said
state banks into said national banks, Resolved Waterman was the
proprietor and holder in his own right of certain shares of the
capital stock of said banks, and as such proprietor and holder
of said stock joined in authorizing the said conversion of said
banks into national banks.   That upon the conversion afore-
said, all the property assets and choses in action of said state
banks, including the stock-books thereof, were, pursuant to the
provisions of said chapter 535 of the statutes of this state, trans-
ferred to and vested in said national banks, by virtue whereof
said Resolved Waterman became the proprietor and holder of
the same number of shares of the capital stock of said national
banks, in the place and stead of the shares of stock so as afore-
said held by him in said state banks respectively, and the said
Resolved Waterman, from the time of becoming such proprietor
and holder of said shares in said national banks, continued to
be such proprietor and holder thereof until the making of a
transfer thereof by him to the plaintiffs.   That sundry promis-
sory notes made by Orray Taft & Co., payable to the order of
said Resolved Waterman, and by him indorsed for the sole
benefit of said Orray Taft & Co., as accommodation indorser
thereof, were discounted by said respective national banks, and
upon being presented for payment as they respectively fell due,
were not paid, whereof the said Resolved Waterman, as said
indorser thereof, had due notice ; and the said notes severally
remain unpaid in the possession of the respective defendant
corporations as the lawful holders thereof.   That on the ninth
day of March, 1867, said Orray Taft & Co., and said Resolved
Waterman, became and were insolvent, and have so continued
from thence hitherto.   That on the 7th day of May, 1867, said
Resolved Waterman requested permission of said defendant
corporations to transfer his shares of stock in said corporations
to the plaintiffs upon the books of said corporations in the man-
ner prescribed by the boards of directors for the transfer thereof,
which permission said defendant corporations refused; where-

Lockwood and others, trustees, v. Mechanics National Bank, &c.

upon the said Waterman, by his deeds duly executed for that purpose, transferred his shares of stock to the plaintiffs, which said transfers the plaintiffs presented to said defendant corporations, and requested that the same might be recorded upon the transfer books of said banks, which the defendant corporations refused to do; and thereupon, the plaintiffs requested the defendant corporations to permit them, as the attorneys of said Waterman, to transfer the said shares of stock to themselves upon the books of the said banks, in the form prescribed by the directors, which request the defendants also refused. That before and at the time of the execution and delivery of said deeds from said Waterman to the plaintiffs, the plaintiffs knew of said Waterman's liability and indebtedness to the defendant corporations, and that the defendants claimed and insisted upon their right to refuse, and accordingly would refuse, to permit said shares to be transferred to the plaintiffs, or any other person or persons upon the books of said defendant corporations until such liability and indebtedness should be fully paid and satisfied. That the said shares of stock have not been sold or disposed of by the defendant corporations.

It also appeared that said Waterman was a director of said "Roger Williams Bank" at the time of its said conversion, and as such director, with the other directors, signed the said articles of association, which said articles of association, as well as those of the other defendant banks, were filed in the office of the Comptroller of the Currency according to the provisions of said act of Congress, as and for the articles of association of said "Roger Williams National Bank" under that act; and that, upon the organization of said "Roger Williams National Bank," said Waterman became a director thereof, and as such director was present at the meeting of the board of directors when said by-laws were passed, and voted for the passing thereof.

The by-laws of the Roger Williams National Bank were as follows:—

"1st. The stock of each stockholder of this bank shall at all times be pledged and liable for the payment of any debt due or owing from such stockholder, whether as principal debtor

or otherwise, to the bank, and may be sold, or so many shares thereof as shall be necessary, by the directors, at public auction, for the satisfaction of such debt on default of payment thereof, and the surplus, if any, shall be paid to such stockholder.

" 2d.  No stockholder who shall be indebted to the bank as principal debtor or otherwise, shall, while thus indebted, be allowed to sell and transfer his share or shares without the consent of the directors for the time being."

That of the National Bank of Commerce was as follows :—

" The stock shall be transferable at the bank only by the stockholders or their agents, in the form prescribed by the president and directors.  No 'person indebted to the bank shall be allowed to sell or transfer his or her stock without the consent of the directors, and this whether indebted as principal, surety, or indorser, either individually or as copartners, and whether the debt has become due or not.  The stock of each stockholder shall be liable and may be sold at auction, by order of the president and directors, for the payment of any debts due from such stockholders to the bank, or so much thereof as may be necessary, in default of payment thereof when due ; but sixty days' previous notice of such sale shall be given in one of the Providence newspapers, and the surplus of proceeds over snch debt and expenses, if any there be, shall be paid to such stockholder."

Those of the three remaining defendant corporations were substantially like that of the National Bank of Commerce, except that those of the Mechanics and American Banks contained no provision for the sale of the stock by the bank for the payment of the stockholders' indebtedness to it.

The suits against the National Bank of Commerce and the American National Bank involved a further question as to the legality of the adoption of such by law by said banks respectively.

By the agreed statement of facts in the former case, it appeared that, from the time of the organization of said National Bank of Commerce, it had always had a board of nine directors, duly elected and qualified to act, except that, shortly after the annual

Lockwood and others, trustees, v. Mechanics National Bank, &c.

election in January, 1867, two of the directors became disqualified, namely : Mr. Walter Manton, on the 18th of February, 1867 ; and Mr. Edward P. Taft, on the 9th day of March, 1867. That the by law in question was entered upon the minute-book of the bank September 4th, 1865, the time for holding the regular weekly meeting of the board, when only three of the directors were present; but the provisions of said by-law, being a copy of the provisions of section 2, article 4, of the act of incorporation, were previously considered and assented to by at least a majority of the full board of directors, in their official capacity, at previous regular board meetings, as and for a by-law of the bank. That the usual course taken in relation to the general management of the business of the bank, both before and after it became a national banking association, was, that when three directors were present, all transactions by them were deemed finished. That, from the time of the passage of said by-law, as aforesaid, all the directors, for the time being, knew of its existence upon the books of the bank, and the same was deemed and reputed by such directors to be a by-law of the bank; and the discounts of the promissory notes endorsed by said Waterman, as well as all other discounts of the negotiable paper, to which any stockholder of said bank was a party, were made upon the understanding by the board, that, by virtue of said by-law, the bank would be entitled to the lien which said by-law purports to create.

As well before as after the discounting of said fourteen promissory notes, the provisions of said by-law were frequently referred to and spoken of by the members of the board at regular board meetings, when at least a majority of the directors were present, and said by-law was then treated and considered by them in the making of the discounts from time to time applied for, as well by members of the board as others, being stockholders of the bank, as furnishing additional protection to the bank for such discounts, and on some of those occasions said by-law was fully and deliberately read to the board by the cashier, or some other officer of the bank, in order that the board, before making the discounts applied for, might fully understand the extent to

which said by-law afforded to the bank additional protection for such discounts.

The agreed facts with reference to the adoption of the by-law by the American National Bank, are stated in the opinion of the court, near the close thereof.

*Currey and Rogers,* (*Caleb Cushing with them,*) *for the plaintiffs:*

I. The by-laws, if valid, create a lien on the shares of each stockholder as security for any debt or liability which he may contract with the bank, either as principal, surety or endorser. 1. This lien arises from the consent, express or implied, of the stockholder to the by-law, and the regulations which it contains are the conditions on which he holds his stock. *Vansandts* v. *Mid. Co. Bank,* 26 Conn. 144. 2. The lien attaches by force of the by-law as an immediate, present, operative security, on the instant of the creation of any debt or liability by a stockholder. *Cross* v. *Phenix Bank,* 1 R. I. 39. 3. By express terms of the by-laws, the lien attaches for *any* debt of a stockholder, however contracted; it must therefore attach as security for a debt contracted by a loan or discount, and as well to the stock of an endorser or surety as to that of the principal. 4. To make debts by loans and discounts is the principal business of banking, as the security of such debts is the primary object of these by-laws; and it would be contrary to all experience in such business for a bank, holding such security, not to make its loans and discounts in reliance upon it.

II. The by-laws are not valid : first, it was not competent to the board of directors to adopt such by-laws; second, they were not adopted by the competent authority; third, they were not regularly adopted.

*First.* The board of directors were not competent to adopt these by-laws, or by-laws of any such character. A mere power (section 8) " to define and regulate by by-laws the *manner* in which the stock shall be transferred," is not a power to limit its transfer upon the payment of debt. The *manner* of a thing is not the thing itself. The transfer of stock may be in various manners. The right of transfer is greater than the manner, and is inherent to the dominion of property. Primarily the

right of alienation and transfer, in every proprietor of stock in a corporation, is absolute, subject only to reasonable regulations as to the manner of its exercise. Only the sovereign power can impose burdens upon an absolute right. When, therefore, it is claimed that by these words, "to define and regulate by by-laws the manner of transferring the stock," more than mere manner, way or method is meant,—some usage must be shown to warrant such a construction. Examples in acts of incorporation, of similar language to this in section 8 of the National Currency Act, conferring the power of making by-laws to regulate the manner of transferring stock, are numerous in acts of legislation, but without the force or effect sought to be placed on this language. In 64 acts of incorporation passed at the May session, 1865, of our General Assembly, the distinction is broadly made between a power to prescribe by by-laws the manner of transferring stock, and the power of subjecting the right of transfer in a delinquent stockholder to the payment of his liabilities to the corporation. Schedule, May session, 1865, pp. 41, 42, 44, 46, 48, 49, 51, 52, 54, 55, 57, 58, 61, 62, 64, 65, 66, 72, 74, 75, 76, 77, 78, 81, 82, 84, 85, 87, 88, 90, 92, 93, 95, 96, 98, 99, 101, 108, 110, 113, 114, 118, 122, 127, 128, 132, 134, 135, 136, 137, 138, 140, 142, 143, 145, 146, 148, 153, 155, 157, 158, 160, 162, 164, 167. The same distinction is made in the National Currency Act of 1863, and in these same by-laws. Nor are there any incidental powers in these banks to make such by-laws ; or ·if there might be by the general law of corporations, it is forbidden by the specific grant. The .grant might have been larger, but this would have been against the policy of the act, as shown in the provisions of the 35th section. Unless, therefore, a power "to define and regulate by by-laws the manner of transferring the stock," contains a power to burden the transfer with a liability for debt, there is no power in these banks so to burden the transfer of its stock by by-laws of any character. *Inclusio unius, exclusio alterius.* *Child* v. *Hudson's Bay Company,* 2 P. Wms. 207.

*Second.* The by-laws were not adopted by the competent authority. The power to enact by-laws is vested, not in a ma-

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

jority or quorum of the board, but in " the board of directors " as a body ; and it is a clear principle of law, that when authority is conferred on several persons as a body, or collectively, all must be present to exercise it. Our state constitutions define what shall be a quorum for business in legislative bodies. This act does not provide for a legislative quorum of the board of directors, but expressly confers the power of enacting by-laws upon the board itself. Cush. Law & Prac. Lg. Ass. § 246 ; *Grindley* v. *Barker*, 1 B. & P. 236 ; *Rex* v. *Lernister*, 8 East. 332 ; *Rex* v. *Hinckley*, 12 East. 361 ; *Rex* v. *Lime Regis*. 1 Doug. 357–8, 9. That the full board of directors as an entire body, never assembled in board meeting to confer together concerning any of these by-laws, is a fact not in controversy in these suits.

*Third.* The by-laws were not regularly adopted. If a majority of the board could adopt by-laws, it does not appear that a majority ever conferred together in board-meeting, at one and the same time relative to the adoption of these by-laws. In the case of the National Bank of Commerce, the record disproves the presence of more than three directors at the adoption of their by-laws. This record cannot be impeached by the party producing it, being in this case also the party that made it. It is only where there is no record, or the record is lost or has perished, that the evidence or usage is admissible to prove a by-law. Here the record shows that the by-law was never regularly adopted, and renders incompetent all evidence of any other act of the board or members of the board concerning it. The plaintiffs, therefore, object to all evidence of this character.

III. The by-laws, however adopted, are nugatory and void, as not consistent with the provisions of the National Currency Act. § 35. 1. The act prohibits all banks organized under it, from making any loan or discount on the security of shares in its own capital stock ; the by-laws undertake to give such security for loans and discounts. The by-laws are intended to operate, and if valid, do operate as an immediate, present security from the moment of the inception of the stockholder's liability. The necessary operation and obvious design of either

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

of these forms of by-law, is security from loss on any kind of debt or liability of a stockholder, whether from loans and discounts or other transactions, and to attach that security to such stockholders' shares from the moment of a loan or discount. To say in the place of this, that the loans and discounts are not made upon that security, must either falsify the fact, or stultify every party to the transaction. If it is said that the loans and discounts are made primarily on other securities, looking to this only in the last resort, it comes to the same thing, for they still are loans and discounts on the security of the stock, how much or how little is not material to the question. They would not be made but for this security; they are, therefore, made upon it. Boards of directors believing that they have such a security, must be presumed to make all their loans and discounts in more or less immediate reliance upon it. 2. It thus clearly appearing that the necessary operation and obvious design of the by-laws is inconsistent with the prohibition of the act, it is not for the plaintiffs to show that they did so operate in these cases, but for the defendants to show that they did not, and that it did, or was designed so to operate in these particular cases, plainly appears as well from the general tenor of the agreed facts, as from the claim itself of the defendants upon the stock, and their whole attitude with respect to the question, in their defence of these causes. 3. Nor can it be said that the prohibition does not apply to the case of an endorser. 4. The inconsistency of the by-laws with the act becomes the more manifest the more nearly we compare their respective provisions. The prohibition consists of two parts. By the first part, the dominion which every man has over his own property is taken away. The banks shall not loan their money on the security of their capital shares, and conversely, the proprietor of those shares shall in no way make them liable for a loan, either as principal, surety or endorser. This is the prohibition and with which the by-laws are in direct conflict. By the second part, this dominion over one's use of his own property, prohibited in the making and procuring of loans and discounts, is restored, and these banks may become the purchasers or holders of shares in their

Lockwood and others, trustees, v. Mechanics National Bank, &c.

own capital ; yet so that such purchase or holding shall have become necessary to prevent loss on a debt previously contracted. The by-laws do not wait for the development of this necessity. They seize upon a stockholder's shares at the instant of the creation of his debt, as surest unfailing security for it. It is in this manner,—by their necessary operation and effect,—and by their infallibly self evident design, that the by-laws are palpably inconsistent with the provisions of the act, and, therefore, nugatory and void. 5. This interpretation is confirmed by reference to the provisions of the National Currency Act of 1863, §§ 36, 37. By the 36th section of that act, a lien is made to attach to the shares of a delinquent stockholder as security for a matured debt by force of the act itself, the same as by these by-laws, except that the lien which they create attaches at the making of the debt. The 37th section contains the same prohibitions as to loans and discount as section 35 of the act of 1864, and the lien of section 36 is made to conform to this prohibition, by not attaching to the shares till the debt "has become due and remains unpaid ;" whereas the lien given, or intended to be given, by these by-laws, attaches at the moment of the loan or discount. This repugnancy is most manifest, and speaks for itself. U. S. Statutes at Large, 1862–3, 675–6. This interpretation agrees with contemporaneous construction by the law makers themselves in the halls of Congress, in debates upon the act, (Cong. Globe, 1863–4. Part II. 1391,) and is entitled to more weight than that of the controller of the treasury, who is not a judicial officer, and whose construction is merely ministerial. Mor does it appear by the agreed statement, whether the "Instructions and Suggestions" of that officer, nor from that document itself, whether it was drawn up with reference to the National Currency Act of 1863 or 1864. 6. The lien given, or intended to be given, by these by-laws, being of universal application and attaching at every new liability of a stockholder, either as principal, surety or endorser, it follows, of inexorable certainty, that every such new liability, arising from loan, discount or other consideration, is contracted upon the security of the shares to which the lien attaches. Consequently, all these

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

several loans and discounts made on this paper to which Re-solved Waterman was a party, as endorser, were made on the security of his shares in the capital stock of the banks, and therefore wrongfully and illegally made. Or, if on the other hand, the by-laws do not have this operation and effect,—if the lien which they create is not to be regarded as constituting a basis of credit at such particular loan or discount,—they can have no effect with respect to such loan or discount, and the shares are not holden for them by any lien, legal or equitable. 7. By the second part of the prohibition, section 35, these banks may be the "purchasers or holders" of shares in their own cap-ital, when necessary to prevent loss on a debt previously con-tracted. They have never purchased these shares, or taken any assignment of them pursuant to this provision. A buyer im-plies a seller, and Mr. Waterman has never sold or assigned them to the banks. They have acquired no title in either of these ways.

Finally. The by-laws being invalid, either because it was not competent to the board of directors under the law, to adopt them, or because, not the board, but only a majority of the board attempted to adopt them, or because they were not regu-larly adopted by a majority of the board, they could give the defendants no lien on Mr. Waterman's stock; or, *secondly*, if valid, they were nugatory and void, because inconsistent with the provisions of the act, and the security which they were de-signed to give upon the stock, was forbidden by the act; or *thirdly*, though it shall be held that the by-laws are valid, and not inconsistent with the act, nor necessarily operating to create a lien at the time of the loan, but only so as to enable the di-rectors to raise a lien, when and if afterwards, it should become necessary to prevent loss, yet there is no evidence of any act of the directors designed to raise such lien upon Mr. Waterman's stock till after its assignment to the plaintiffs, who have there-fore the prior and better title.

*Bradley, Hart, James Tillinghast and Markland, (B. R. Curtis with them,) for the defendants :—*

I. The by-law, if valid, enables the directors to raise *an equi-*

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

*table lien,* on the shares of each stockholder, as security for any debt due from him to the bank, either as principal, surety, or indorser, whenever they shall so determine, and the bank may lawfully refuse to permit a transfer of the shares upon its books until such equitable lien has been discharged by payment of such debt. This equitable lien arises from the implied consent of the holder of the shares, to the regulation contained in the by-law; by force of which a transfer may be withheld until payment. *Union Bank of Georgetown* v. *Laird,* 2 Wheat. 390; *Child* v. *Hudson's Bay Company;* 2 P. Wm. 207; *Morgan* v. *Bank of North America,* 8 S. & R. 73; *Vansandts* v. *Midland Co. Bank,* 26 Conn. 144; *Brent* v. *Bank of Washington,* 10 Pet. 616; *Green,* &c., v. *Farmer,* &c. 4 J. Burrows, 2214, and cases here-after cited under other points.

II. This by law is valid. The National Currency Act (Sec. 5), provides for articles of association which may contain any provisions consistent with the provisions of the act, for the regulation of the business of the association and the conduct of its affairs. The articles of association in question empowered the directors of the bank to prohibit, by a by-law, the transfer of stock owned by any stockholder who may be liable to the association, either as principal debtor or otherwise, without the consent of the board. These articles were signed by the directors of the state institutions with the consent of Waterman, and he became the owner of stock in the associations formed under these articles to the extent and in the place of the stock held by him in the state banks. The by-law made by the directors, under this authority, is within the power conferred on the directors by the articles of association, and is sanctioned, and not prohibited, by the National Currency Act. The 8th section confers on the board of directors " power to define and regulate, by by-laws not inconsistent with the provisions of this act, *the manner in which its stock shall be transferred ;*"and this by-law is within this provision. If it were not, it is within the articles of association, and no express authority in the act to make such a by-law is necessary. *Child* v. *Hudson's Bay Co.* 2 P. Wms. 207; *Arnold* v. *Suffolk Bank,* 27 Barb. 429; *McCready* v. *Rumsey,* 6 Duer,

576 ; *McDowell* v. *Bank of Wilmington*, 1 Harrington, 27 ; *Morgan* v. *Bank of North America*, 8 S. & R. 73 ; *Tuttle* v. *Walton*, 1 Kelly, 43 ; *Cunningham* v. *Al. L. Ins. Co.* 4 Ala. 652 ; *St. Louis Ins. Co.* v. *Goodfellow*, 9 Misso. 149. It was adopted by competent authority. *Hoyt* v. *Sheldon*, 3 Bosworth, 267 ; National Currency Act, 1864, § 8; *Sargent* v. *Webster*, 13 Met. 497 ; *Crane* v. *Bangor House*, 3 Fairfield, 354; *Lane* v. *Brainerd*, 30 Conn. 577 ; *Grindley* v. *Barker*, 1 Bos. & Pul. 236 ; *Rex* v. *Hinckley*, 12 East. 361 ; *City Mut. Ins. Co.* v. *Sawtell*, 8 Allen, 223 ; Angell & Ames on Corp. § 501.

III. The only question is, whether such a by-law is consistent with the provisions of the National Currency Act. Such a by-law is entirely consistent with a uniform practice, to make loans and discounts only on the usual banking principles, of requiring a solvent promisor and a solvent indorser (as was required in these cases), or a solvent promisor and sufficient collateral security, other than the stock of the bank, the legal title to which is transferred to the bank. This by-law was designed to answer a legitimate and proper end, of furnishing to the bank a means of compelling payment of loans and discounts made on the usual banking securities, and not on the security of its own shares when those usual banking securities have proved insufficient, and the debt remains unpaid. To render it merely void, as inconsistent with the prohibition, it must be shown that its necessary operation and obvious design is inconsistent with the prohibition : this is not true, and cannot be shown. To render it inoperative in the particular case, it must be shown that it was so used, or did so operate in the particular case, as to be inconsistent with the prohibition. But this is not consistent with the agreed facts. The second part of this prohibition is manifestly directed against the acquisition by a bank of the ownership of its capital stock ; which is permitted only when it is obliged either to purchase or take security by a transfer of its own shares to prevent loss of a debt previously contracted on proper banking principles ; and it requires the bank to sell stock so acquired within six months. But this prohibition to become holders or owners of its own stock, has nothing whatever to do with the by-law, that the

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

shares owned by a delinquent debtor cannot be sold and transferred by him. By force of such a by-law, the bank is not "the purchaser or holder" of any such shares. It simply acquires an equitable lien thereon, when the directors refuse to permit the stock to be transferred. From the terms of the bylaw, there must be a debt contracted before the directors can have any authority to refuse a transfer; and if, as in each of these cases, it was contracted in good faith, and the shares were needed to prevent loss of such a debt, the prohibition does not apply. In the case of *Vansandts* v. *Mid. Co. Bank,* 26 Conn. 144, the Supremé Court of Connecticut held, that a corresponding provision could have no application to the case of an indorser. If the meaning and effect of this 35th section were doubtful, the contemporaneous construction of the law, by that department of the government appointed to execute it, and, in accordance with whose instructions, it has gone into effect throughout the United States, would be entitled to great respect, and should not be disturbed save for the gravest reasons. *Edwards' Lessee* v. *Darby,* 12 Wheat. 206. It appears that the Comptroller of the Currency, charged with the execution of this law, under the supervision of the Secretary of the Treasury, has given a practical construction to the law, which renders such a by-law consistent with its provisions, and that, in accordance therewith, all the national banks of the United States have been organized and operated.

IV. In the case against the National Bank of Commerce, although it appears by the copy record thereof annexed to the agreed statement, that it was passed at a meeting when *only three* of the directors were present, the by-law was not void, but was well and sufficiently established. There is nothing, either in the National Currency Act, or the articles of association of the National Bank of Commerce, prescribing the mode in which the by-laws of that bank shall be made and adopted, in order to their validity. In view of this silence, it was not necessary to the validity of this by-law, either that it should have been reduced to writing when determined upon by the proper quorum, or that such quorum should have been actually present

Lockwood and others, trustees, v. Mechanics National Bank, &c.

when the by-law was entered upon the minute-book of the bank. It is enough, as is here found, that before the by-law was placed on the minute-book by the three directors, it was "considered and assented to " by the requisite number of directors officially, " as and for a by-law of the bank;" and that the existence of this by-law upon the minute book, was always known to and deemed and reputed by " all the directors for the time being " to be a by-law of the bank." *Bank U. S.* v. *Dandridge,* 12 Wheat. 64, 70 ; *Union Bank of Md.* v. *Ridgely,* 1 Har. & G. 324 ; Angell & Ames on Corp. § 328 ; *Rex* v. *Ashwell,* 12 East. 22 ; *United States* v. *Fillebrown,* 7 Pet. 47 ; *Taylor* v. *Griswold,* 2 Green (N. J. Law), 223, (second opinion) ; *Ex parte Rogers,* 7 Cowen. 526 and note ; Angell & Ames on Corp. § 511 ; Lindley on Part. 205. The action of the three directors in placing the by-law upon the book, was a ministerial act merely, which might be performed as effectually by three as by a majority of the directors ; and especially so, as it appears by the agreed facts, " that the usual course taken in relation to the general management of the business of the bank, both before and after it became a national banking association, was, that when three directors were present, all transactions by them were deemed finished." *President, etc., B. & D. Turnp. Road* v. *Myers,* 6. S. & R. 12. If a vote is passed at a meeting of the directors to do a certain thing, and this is void, because of there not being a sufficient number of directors present, the vote may, nevertheless, be afterwards ratified by the subsequent action upon it of the number constituting the proper quorum. *Atlantic Fire Ins. Co.* v. *Saunders,* 36 N. H. 252 ; Angell & Ames on Corp. § 502 ; *Flecknor* v. *Bank U. S.* 8 Wheat, 363 ; *Buckley* v. *Derby Fish Co.* 2 Conn. 254 ; *Hayward* v. *Pilgrim Society,* 21 Pick. 274 ; *Burrill* v. *Nahant Bank,* 2 Met. 167. The usage of a bank is presumed to be known to the parties dealing with it, and it becomes a part of the contract between them. *Waler's assignees* v. *Bank of North America,* 8 S. & R. 73 ; *Mills* v. *Bank U. S.* 11 Wheat. 431 ; *Bank of Washington* v. *Triplett,* 1 Pet. 25.

POTTER, J. The by-laws of three of the banks contain provisions that the stock shall be transferable only on the books of

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

the bank, and that no stockholder shall be allowed to transfer, while indebted, without consent of the directors. The by-laws of one other contain these provisions, and also a provision that the stock shall be held pledged and liable, and may be sold, etc. There is some diversity of language, but not enough to affect the present decision.

The by-laws of the Roger Williams Bank contains provisions that the stock shall be held pledged, liable, etc., and that an indebted shareholder shall not be allowed to sell without the consent of the directors.

The question is, had these corporations the power, under the act of Congress of 1864, to make these by-laws ? and we shall consider all the cases together, as, according to our view, if they had the power to make either by-law, they had the power to make both.

The act of 1864, section 5, specifies that the articles of association may declare in general terms the objects of the association, and " may contain any other provisions not inconsistent with the provisions of this act, which the association may see fit to adopt for the *regulation of the business* of the association and the *conduct of its affairs.*" And section 8 empowers the board of directors " to define and regulate, by by-laws not inconsistent with the provisions of this act, the *manner* in which its *stock shall be transferred,* its directors elected or appointed, its property transferred, its *general business conducted;* and all the *privileges granted by this act* to associations organized under it shall be exercised and enjoyed."

The act of 1863, section 11, contained a provision authorizing a bank to make by-laws for " the management of its property, the regulation of its affairs, and for the transfer of its stock."

In the case of *Child* v. *Hudson's Bay Co.* 2 P. Wms. 207 (Angell & Ames on Corp. § 356), the company were empowered to make by-laws for the better government of the company, and the regulation of their trade. By virtue of these powers, they made a by-law, by which, if any member became indebted to the company, his stock should be liable for the debt. This by-law, in a contest between the assignees in bankruptcy of the

stockholder and the company, was adjudged good. In *Cunningham* v. *Alabama Life Ins. Co.*, 4 Ala. 652, a provision in the charter that the stock should be assignable on the books of the bank under such regulations as the trustees should establish, was held to authorize a by-law, that "no stockholder shall be permitted to transfer his stock while he is in default." In *St. Louis, etc., Ins. Co.* v. *Goodfellow*, 9 Missouri, 149, Goodfellow was assignee for value. By the charter, the stock was transferable according to such rules and restrictions as the directors should establish, and they made a by law prohibiting any transfer by a person indebted to the company, and the certificate stated the stock was transferable on the books, conformably to the charter and by-laws. The court, while they held the assignment good between the vendor and vendee, and that it conveyed all the vendor's right to the vendee, held that the words of the charter justified the by-law, and that what was sufficient to put the purchaser upon inquiry was notice to him. They likened it to a case of set off. In the case of *Assignees of Waln.* v. *Bank of North America*, 8 S. & R. 73, the court (p. 89) speak of the case *Child* v. *Hudson's Bay Co.*, 2 P. Wms. 207, as recognized law. We shall refer to this again. In the case of *Brent* v. *Bank of Washington*, 10 Peters, 615, the U. S. Supreme Court, after referring to 8 S. & R. 73, 86, among other cases, go on to say: "Though the charter has not made the note a lien on the stock till protested   *   *   *   yet it has given them the power to prevent a transfer, unless upon their books, by such rules as they may prescribe, which gives them the power to prevent the legal title from passing to the purchaser," etc., etc. In *McDowell* v. *Bank of Wilmington*, 1 Harrington (Delaware), 27, the articles of association recited and confirmed in the charter, gave the directors power " to make rules concerning the transfer of stock," and also to make by-laws. The directors made a by-law that no stockholder should sell while indebted. The court said they saw nothing in such a by-law unreasonable or repugnant, etc. It did not affect others than members.

The language which was used in the act of 1863, authorizing the banks to make by-laws not inconsistent with any existing

law, for the management of their property, the regulation of their affairs, and for the transfer of their stock, is, word for word, the same with the statute of New York (Edmonds ed. vol. 1, 556, part 1, ch. 18, title 3, on the general powers of corporations), as was also a considerable part of the subsequent portion of the section, giving them power to loan, etc. Edmonds, 4, 131. Now we believe the power to make a by-law of the nature now in question was never denied in New York. It is indeed decided in *Bank of Attica* v. *Manufacturers and Traders' Bank*, 20 New York, 501, that as the 19th section of the Bank Act, chap. 260, of 1838 (Edmonds, 4, 132), provides that the shares shall be "transferable on the books of the association *in such manner as may be agreed on in the articles of association*," the provision must be in the articles themselves, and the association could not delegate to the directors a power to make such a by-law as they had made. The New York act also contains a provision, that every person purchasing shall succeed to all the rights and liabilities of the preceding holder. Judge Allen delivered a very able dissenting opinion. But in a subsequent case, *Leggett* v. *Bank of Sing Sing*, 24 New York, 283, where the articles provided that the stock should not be transferred until all debts due were paid, the lien was held good against an assignee taking with notice. All the Judges, as far as appears, acknowledged the validity of the lien; but a minority dissented, on the ground that the language used in the articles did not cover debts not due. In this case, the certificate expressed the liability for indebtedness.

One of the plaintiffs' points in the present case is, that the power to regulate the manner of transfer does not include a power to impose a burden on it—to create a lien. It will be observed that this is substantially the language of the New York act, "transferable in such manner," etc. And on looking at the eighth section of the Banking Act of 1864, we find that the word *manner* is used not only with reference to the transfer of stock, but applies to the whole of the following paragraph, and that it will not do to give it the very limited meaning contended for by the plaintiffs.

Lockwood and others, trustees, v. Mechanics National Bank, &c.

In the present cases, although the articles of association of the different banks profess to give the directors power to make by-laws, etc., no question of the sort raised in New York can arise, because the act of Congress of 1864 itself, in section 8, expressly confers on the directors the general powers of making by-laws, regulating the manner of transferring stock, etc., and conducting its general business. The words in the act of 1864, sections 5 and 8, although not exactly the same as those in section 11 of the act of 1863, are the same in substance, except that the act of 1863 had given these powers to the association, and had not expressly provided that the directors might exercise them.

Why was the act of 1863 revised and amended so soon after its passage, by a new act substituted for and repealing the former? The Comptroller of the Currency, in his report in December, 1863, urges a revisal, because the act of 1863 is not symmetrical, nor clear, if even consistent, in all its provisions. He therefore recommends that it be revised, cleared of obscurities, and that the parts relating to the same subject be placed in juxtaposition, and specifies many particulars. The Secretary of the Treasury endorses the recommendations of the comptroller. But neither officer suggests any objection to the 36th section, or to the usage so prevalent in a large part of the Union of making such by-laws as the ones now in question. Up to that time, but one bank had been organized in Rhode Island, under the act, and one hundred and thirty-four in all. All the present defendant banks were organized under the act of 1864. The new act, as compared with the old, seems to be much improved, better arranged, and stripped of much useless verbiage, and we can understand many reasons why the provision in section 36 was omitted. It was useless; because Congress had already, in other parts of the act (as also in that of 1863), used words which the text-books recognized as conferring, and which the courts had decided did confer, the power to make a by-law pledging the stock. They were rather worse than useless, because as they prohibited a transfer only in case the holder was indebted for debts due and unpaid, it seemed to imply that if

the debt had not fallen due, the holder might transfer, and that in such case, the bank could have no lien. And it may be supposed, further, that while the act of 1863 positively prohibited a transfer in the case of a debt due, the omission was intended to leave it in the discretion of the bank, whether it could have such a by-law or any by-law at all upon the subject: some banks might prefer not to have any. As the power is conferred by other parts of the act, we think no inference can be drawn against these by-laws from the omission of this clause in the new act; as we can suppose many other reasons for its omission, equally probable with those suggested by the defendants, and fully consistent with an intention to retain such a power in the banks.

Is it, in the next place, inconsistent with other parts of the act, or with the policy of the act? It is alleged by the plaintiffs, that the object of Congress was, to break up that old practice of loaning upon stock, a practice which, they say, led to the creation of much fictitious bank capital and was one of the great objections to the old system. The practice of loaning upon stock was common in the old state banks of New England, and we believe many of the states. Sometimes the vote contained a clause specifically pledging the stock for the loan, and sometimes not. The distinction was, that no endorser was required, and that the bank had no security but the maker and his stock. This power, though at times very convenient, was, in the hands of reckless or dishonest men, a dangerous one. Now this practice of loaning upon stock alone, Congress did prohibit in the new national banks, by language very plain, but not plainer in the act of 1864 than in that of 1863. They have done it by several provisions: 1st. The act of 1863 provided, section 37, that no loan should be made on security of its capital stock, but "the same security, both in kind and amount, shall be required of shareholders as of other persons," and implies that the security must be adequate for the debt—*independent of any lien upon the stock.* In the act of 1864, section 35, there is the same provision, substantially, that they shall not loan upon security of their own stock, but the words we have put in quota-

Lockwood and others, trustees, v. Mechanics National Bank, &c.

tion marks above are omitted, as entirely unnecessary. 2d. As the principal danger in all banks is from mismanagement by directors, they have required, section 9, each director to make oath, that he is the *bona fide* owner of his stock, and that it is not pledged or hypothecated for any loan or debt. This provision is much more strict than the corresponding one in section 39 of the act of 1863, which only required him to swear that his stock was not pledged for any debt due to his own bank. That a general pledge by by-law would not be considered as a hypothecation, see *Ex-parte Wilcocks et als.*, 7 Cowen, 401. 3d. And the creation of fictitious capital was further guarded against by section 35 of the act of 1863, by which the whole amount of debts due from all the stockholders was limited, and in the act of 1864, by section 29, which limits the liabilities of a person or firm.

The implication contained in section 8, by which the power to make loans on personal security is given, would seem at first sight to mean than the banks should loan on the *credit of the person.* But when we look at the history of that clause, we should probably conclude that that was not its meaning. The lines in section 11 of the act of 1863, " to carry on the business of banking by discounting notes, bills, and other evidences of debt; by receiving deposits; by buying and selling gold and silver, bullion, foreign coin, and bills of exchange; by loaning money on real and personal security, etc." (see the act of 1863), are almost word for word the same with the New York Bank Act of 1838, chap. 260, § 19 (Edmonds, 4, 132). After specifying the power to discount all sorts of business paper, which by the usage of banks is generally done on the credit of the person, it goes on to authorize loans on real and personal security. The connection shows that personal estate was meant, and the usage of the New York banks of loaning on pledge of stocks, is well known. In the act of Congress of 1864, they have retained the clause substantially, but omit the word *real*, leaving us, however, still to consider personal security as meaning personal estate, excepting, of course, its own stock, and not personal credit. In the state of Connecticut, the legislature had

taken a similar precaution against fictitious capital, and loans on stock alone. They provided, (Rev. Stat. title 3, § 226,) that " no bank shall make any loan or discount on pledge of its own stock." And in *Vansands* v. *Middlesex Co. Bank*, 26 Conn. 157, the Supreme Court of that state take the same view of the provision we have here taken. " We are fully satisfied (say they) that the law does not by fair construction embrace a case like the present, where paper was discounted by a bank for the benefit of a person who had no interest in the stock in question, not on a specific pledge of the stock, but on the personal security of a party who was a stockholder, and had only previously pledged his stock generally for his future indebtedness or liability to the bank. Such discount cannot be said to be made on a pledge of the stock." In that case, the bank claimed a lien, and it was so expressed in the certificate. The lien was held good against the plaintiff, who was assignee for the benefit of creditors.

In the case now before us, none of the discounts were made for Mr. Waterman, the stockholder.

These considerations show very plainly, that Congress did intend to break up the old practice of loaning on stock alone, without an endorser, and to require the same security of a stockholder, as in other cases, independent of his stock; but they do not show that Congress intended to prohibit the banks from providing, as a measure of prudence and precaution, that if other securities, deemed good at the time of making the loan, should fail, they might then resort to the stock. And having effectually prevented the introduction into the new banks of the former dangerous practice of loaning on stock alone, it may well be considered that Congress intended to allow them to retain a lien on the stock in addition to the securities required in other cases. Restricted as the power is, it could not only lead to no danger, but would in fact promote the credit and safety of the new institutions.

The only doubt expressed in the authorities is, whether such a by-law would be good against a creditor or purchaser for value without notice. Some of the cases seem to have been decided

upon their particular equities, some upon the form of the certificate, but many of them recognize the power to make such by-laws to affect third persons, provided proper notice is given in the certificate, or otherwise where the provision is made by charter, it seems to stand upon stronger ground.

The doctrine laid down by a great number of the authorities is, that where there is a power, either to the association or its directors, to regulate the transfer of stock, or to regulate the manner of its transfer, they may require by by-law the transfer to be made on the books, and in that case the title of a purchaser before entry on the books, although good as between him and the vendor, is not a legal, but a mere equitable title, and, being only an equity, will be subject to the prior equity of the bank. The Supreme Court of the United States in *Union Bank* v. *Laird*, 2 Wheaton, 393, laid down this as the law. The charter provided that the stock should be transferable only on the books according to such rules, etc., and that all debts due should be paid before transfer. The court held that no person could acquire a legal title except by a transfer according to the rules, and if any one took an equitable assignment, he took it subject to the right of the bank, of which he was bound to take notice. In *Stebbins* v. *Phenix Ins. Co.*, 3. Paige, 361, by the charter the stock was assignable according to such rules, and subject to such regulations and restrictions as the directors should establish. A by-law declared that no transfer should be valid, unless made on the books. The chancellor held that the purchaser, before recording, took only an equitable title, subject to any prior equity of the company. See this case commented on by Judge Allen, in *Bank of Attica* v. *Manufacturers' and Traders' Bank*, 20 New York, 512. In *Vansands* v. *Middlesex County Bank*, 26 Conn. 144, the suit was by an assignee (or trustee, as called in Connecticut), for the benefit of creditors. There was no lien by charter or by-law, but a form of certificate had been early adopted, expressing that the stock was held subject to indebtedness to the bank, but there was no record of its adoption. The court held (according to previous decisions in Connecticut) that the stock not having been transferred on the

332                     PROVIDENCE.

books as required, the assignee took no legal title ; he took the title of the assignor, and no more ; an equitable title subject to the prior equity of the bank.    And in *Mech. Bank* v. *New Haven Railroad Co.* 13 New York, or 3 Kernan, 622, 624, 626, by charter the stock was transferable *in such manner* as by-laws should direct, the by laws provided, and the certificate expressed that it was transferable on the books on surrender, etc.    The court, after a very full examination of the nature of bank stock and certificates, and comparing the latter with bills of lading, exchequer bills, etc., say the corporation has the right so to frame the certificate that it shall not be negotiable in the commercial sense, so as to give the purchaser a title superior to the vendor (623), but that this would not prevent the owner from selling outside, so that the vendee could acquire in equity the equity of the vendor.    The case of *Fisher et al.* v. *Essex Bank*, 5 Gray, 373, was a question between a vendee who had not perfected his purchase on the books, and an attaching creditor. By charter the stock was transferable only at the bank on its books.    Chief Justice Shaw, after a full consideration of the nature of this sort of property, and of the certificate given for it, holds that this mode of transfer ought not to be considered as merely for the protection of the bank, but that the weight of authority is greatly in favor of the doctrine, that the legal title does not pass until transferred on the books, and so decided after reviewing a great many cases.

    Anciently, this lien seems to have been upheld as a sort of set off; and the case of the Hudson Bay Company, as reported by Strange, 1, 645, was decided on that ground.    But the same case in 2 P. Wms. 207, is put on the ground of the validity of the by-law.    And Cooke (Bankrupt Laws, 1, 582, 4th ed.) says the former doctrine (set off) was exploded, but cites the case from P. Wms., and the ground there taken, as undisputed law. See also 1 Abr. Eq. Cases, 9.    In *St. Louis Perpet. Ins. Co.* v. *Longfellow*, 9 Missouri, 153, the court likens it to a case of set-off.    In *Waln's assignee*, v. *Bank of N. America*, 8 S. & R. 73, the bank took that ground, but the court do not decide upon it.

    There is no dispute in the present case, but that the loans

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

were made *bona fide*, on what was at the time considered good personal security, and without any intention or supposition that they would ever be obliged to rely upon the stock for security.

It was claimed for the defendants that the opinion of the Comptroller of the Currency, as being the officer appointed by Congress to carry the act into effect, was entitled to great weight. If Congress had expressly empowered him to recommend a prescribed form, this argument would perhaps have been entitled to more consideration. In the language of the Supreme Court, *Edwards, Lessee,* v. *Darby,* 12 Wheaton, 210, his opinion may be entitled to respect, but he is himself bound by the law, and has no power to make or alter, and his constructions are *prima facie* only, subject to be overruled by the proper judicial tribunals. In 12 Wheaton, 210, cited by the defendants, where the court observed that the construction put upon a law by commissioners who were acting under it, was entitled to great credit, their construction had acquired additional force from being acquiesced in or recognized by the legislature. The fact that the comptroller recommended these forms may however have this weight, that as he had recommended a revision of the act of 1863, on the ground (among others) of inconsistent provisions, this recommendation shows he did not think there was any inconsistency between the prohibition of loans on stock, and the banks retaining a lien on stock. Nor do we attach much weight to the reference, which the plaintiffs give us, to the Congressional Globe, 1863–4, page 1391, stating the rejection of an amendment.

It is claimed by the plaintiffs, that the by-law was not in either case adopted by competent authority ; that it must be adopted by the whole board of directors, and not by a mere majority.

We understand the law to be settled, that in case of a definite body, like a board of bank directors, a majority must be present at a regular meeting, or at a special meeting notified according to by-law if there be any, or otherwise reasonably notified to all the members (excepting perhaps cases of absence at a distance) without fraud or attempt at surprise, and at such meeting a majority of those present can act for the whole. 2 Kent's Com.

(side page), 293 ; Dana's Abr. 5, 150 ; *Sargent* v. *Webster*, 13 Met. 497 ; *Cahill* v. *Kalamazoo Ins. Co.* 2 Douglas (Mich.) 124, 137 ; and the meeting will be presumed to be regular unless the contrary appears, *Sargent* v. *Webster*, 13 Met. 497.

If the claim of the plaintiffs means that there had been no by-law made, giving a majority power to act for the whole, and that a majority would have no such power without a by-law, we have only to repeat the articles of association which were made before the by-laws, and which provide that a majority shall be a quorum. In the latter case it was contended that a majority was not sufficient.

The fact that the legislature of Rhode Island have been in the habit of establishing such a lien by special provision in their charters, we do not consider affects the present question. It was probably done *pro majore cautela*, and to avoid the doubts which have been raised as to creditors and purchasers for value. Nor do we consider that the specific grant of power in this case abridges the general power incident to corporations. It is in fact so broad that it can hardly be called specific.

Two of the cases present questions not involved in the others. In the case of the Bank of Commerce, the by-law was entered at a meeting when only three directors were present, "but the provisions of said by-law * * were previously considered, and assented to by at least a majority of the full board of directors in their official capacity at previous regular board meetings, as and for a by-law of the bank ;" all the directors knew of its existence, and deemed it to be a by-law, and it was frequently referred to as a by-law at regular meetings when a majority were present, and considered by them in making discounts as an additional protection, etc. We think there is enough in the agreed statement of facts to show that it was actually adopted by a majority present at one and the same meeting, although not then entered. And although the by-law does not expressly require the transfer to be made at the bank, or on the books, it can make no difference as between the parties to the present case. Even if there was no record or the record was deficient, we consider it settled by the authorities

that the enactment of a by-law need not necessarily be in writing, but it may be inferred from facts proved. See Angell & Ames on Corp., §§238 and 328, and a very strong authority in *Union Bank of Maryland* v. *Ridgely*, 1, Har. and Gill, 413 ; also *Reuters* v. *Telegraph Co.*, 6 Ellis and Black., 341. But the authorities go farther, and hold that even without a by-law, a regulation, practice or usage to this effect is good between the parties and voluntary assignees. *Waln's assignee*, v. *Bank of N. America*, 8 S. & R. 73. And in *Vansands* v. *Middlesex County Bank*, 26 Conn. 144, before cited, the bank claimed that the adoption of the form of certificate, and usage under it, was sufficient proof of a regulation ; and also that their usage, known to the stockholder, not to permit transfer by a person indebted, was a sufficient justification to the bank for refusing to transfer. The court said these positions were strongly supported by the cases, but they decided for the bank on other grounds. We consider that the stockholder, Mr. Waterman, to whose rights and no more the plaintiffs succeed, was bound to know the usage of the banks in which he was a stockholder, and that if any of his paper was discounted at such bank for himself or others, it was subject to this claim. In one of the banks he was himself a director. It is admitted in the present cases that the plaintiffs knew of the banks' claim to the lien when they took the assignment.

We consider, therefore, that it is well settled by reason and authority, that the power to make by-laws to regulate the management of the business of the association, is sufficient to justify a by-law creating a lien on the stock. That the power to regulate the transferring or manner of transferring stock, is sufficient to authorize a by-law creating such a lien. That the power to regulate the transferring or manner of transferring of stock, is sufficient to authorize a by-law that the stocks shall be transferable only at the bank, or on the books ; and, in that case, until such a transfer, the purchaser would take only an equitable, not a legal title, and subject to any claim of the bank, by charter or by-law, or valid usage, or agreement. That a majority, at a regular or legally called meeting, when a quorum is present, is sufficient to enact by-laws. That a by-law informally

Lockwood and others, trustees, v. Mechanics National Bank, &c.

adopted, may be subsequently ratified, and without any record of adoption, may be proved by the usage and acts of the bank, and parties dealing with it.

In the case of the American Bank, the facts are as follows:—Under their state charter, the directors were to be not less than nine, nor more than thirteen in number, and the majority of the number elected made a quorum.　At the last election under the state charter in December, 1864, they elected twelve, two of whom never served.　The articles of association, dated June 6th, 1865, are signed by the ten acting directors, and provide that the board of directors shall be twelve in number, and that the regular annual election shall· be· in January.　The bank was fully organized as a national bank, August 1st, 1865, and the first election under the act of Congress was held in January, 1866.　In the statement of facts of the case, it is agreed that, "in the interim between the conversion * * and the annual election in January, 1866, the said ten acting directors of the American Bank, having been appointed by the stockholders of said American Bank, authorizing the conversion, to act as directors of said American Bank until the regular annual elec· tion," etc., the said ten directors took the oath specified in sec· tion 9 of the act of Congress.　The agreement of the stockholders of the state bank, signed May 1st, 1865, authorized their directors, or a majority, to convert the bank into a national bank, and do everything necessary for that purpose.　But they went on farther, and, in the latter .part of the instrument, ap· pointed twelve directors of the (to be) national bank.　They were still a state bank, and, as such, had no right to appoint directors for the new bank.　The act of Congress gives them no such right, but simply provides, (section 44,) that " the directors aforesaid [of the state bank] may be the directors of the associa· tion until others are elected or appointed in accordance with the provisions of this act."　As soon as organized as a national bank, they might (section 10) have met, and chosen directors ; but they did not choose any until January, 1866.　Who were then the directors at the time of the adoption of the by-laws, August 21st, 1865 ?　By the agreed statement of facts, it ap-

pears that the ten acting directors of the state bank acted as the directors of the national bank. But the articles of association under which the new bank was organized, and which are referred to, and made a part of the statement of facts, provide that the number of directors is to be twelve. This shows their intention that a full board of directors is to be twelve; and the fact of their electing the twelve old directors, although not a legal election, is still of some force, as showing that they did not then consider there was any vacancy in their old board. In all cases where an act is to be done by a corporate body, or part of a corporate body, and the number is definite, it has been held that a majority of the whole number is necessary to' constitute a legal meeting; and that, if the actual number is reduced from any cause, the number necessary to constitute a quorum remains the same; but that, at a legal meeting, a majority of those present may act. 2 Kent, 293; *Cahill* v. *Kalam. Ins. Co.* 2 Douglas, 124, 137; note to *Ex-parte Wilcocks et als.* 7 Cowen, 401; *King* v. *Bellringer,* 4 Term Rep. 810; *King* v. *Miller,* 6 Ib. 268. We consider that, in the case of the American Bank, this rule must apply, and that a majority of the number twelve was necessary to constitute a legal meeting; and that, therefore, the alleged by-law was not legally adopted. In this case, there is no question raised as to inferring the adoption from usage or acquiescence, or as to claiming a lien in any other mode.

*Judgment for the defendants, except in the case of the American National Bank.*

---

After the rendition of the foregoing opinion, upon application made on the part of the American National Bank, the question whether the by-law of said bank was legally enacted, was reargued in writing.

*Bradley, Hart, and Markland, (B. R. Curtis with them,) for the defendant corporation, the American National Bank,* contended, 1st, That the act of Congress under which this conversion took

place expressly authorizes a majority of the state board, *i. e.*, the majority who execute the organization certificate, to act as the directors of the national institution, until they hold an election after their conversion. . That the words, " *The directors aforesaid*," in section 44 of the act, refer to and mean, the majority before spoken of in the section. 2d. That if it be contended that the words " *The directors aforesaid* " mean the whole of the state board, then the ten who signed the organization certificate were the *whole* of the state board ; they being the only ones who accepted the appointment. And consequently, to adopt a by-law legally, a majority of the ten was sufficient.

*Currey and Rogers, for the plaintiffs*, contended, 1st, That inasmuch as the act of election by the stockholders constituted an eligible person a director, without any act on his part, then the two passive members were so constituted by their election, as much as the other ten. They were elected at the same time and for the same term of office, and they might, at any time during the term, have taken their seats at the board, as co-equal members with the others. Where no oath, or bond, or commission is required as a pre-requisite to official functions, the election is the qualification, and the beginning of office. In such a case, the person elected enters upon the office from the date of his election, and unless he becomes disqualified, holds it for his term, irrespectively of the performance of official acts. *Wammack* v. *Holloway*, 2 Ala. 31. 2d. That there being no vacancy in the board of directors at the time of the act of the stockholders authorizing the conversion, there was nothing in the conversion itself, or in the manner of it, to create a vacancy. 3d. That the taking of the oath by the ten acting directors, and its omission by the other two, was of no importance. The oath was not required under the circumstances. Section 44 of the National Currency Act is complete in its provisions for the conversion of state into national banks, and for their government until an election under the new organization. It is silent with regard to the oath prescribed in section 9 ; and the circumstances of a continuing board are not those under which the oath is required. Section 9 provides that " each director, *when appointed or elected,*

shall take an oath," which clearly does not apply to cases, so to express it, of holding over. Congress had some confidence in the state banks, in their organizations, and in their officers, and it provided for their transit under the new law, with as few changes from the old order of things as were practicable. In providing for the continuance of the old board of directors, for a period, at the longest, less than a year, it was determined to accept them as they might be found, without exacting new pledges of fidelity in the midst of an unexpired term of office. Therefore, neither the taking the oath by the ten, nor its omission by the two, could have any influence in qualifying or dis-qualifying either party for the office of directors till the time appointed for an election. But admitting the requirement of the oath prescribed in section 9 to apply to the directors of a converted bank, it would not follow that the omission of the oath disqualified them. This provision of the act is evidently directory merely. The language " when appointed or elected," is not equivalent to " before they shall be capable of acting as directors." The omission of the oath would not create a vacancy It is presumed that the directors of a newly organized bank, of whom the oath is certainly required, might omit it altogether and still be capable of acting as directors. There is no penalty or forfeiture prescribed for its omission, and the act is not man-datory.

*Bradley, Hart and Markland, (B. R. Curtis with them,)* for the *defendant,* in reply, cited the following authorities and made the following points to sustain the proposition that the language, " each director shall take an oath," &c., in section 9 of the National Currency Act, was mandatory, and consequently only the ten directors of the American Bank who had acted as directors of the state bank, and executed the organization certificate and taken the oath, constituted the board of directors of the national association.

The language is, each director *shall* take an oath, &c. It is imperative. It is not simply negative words that will make a statute imperative. Affirmative words may equally make a statute provision imperative. Dwarris on Statutes, page

Lockwood and others, trustees, *v.* Mechanics National Bank, &c.

715, side-paging; *Davison* v. *Gill*, 1 East. 64; *Rex* v. *Loxdale*, 1 Burr. 447. The words used in section 9 are absolute, explicit and peremptory. The language is equivalent to saying, "before they shall be capable of acting as directors," they shall take the oath. It is a general rule, in the construction of a public statute, that the word "may" is to be construed "must" in all cases where the legislature meant to impose a positive and absolute duty, and not merely to give a discretionary power. *Minor et al.* v. *Mechanics Bank*, 1 Pet. 46. "May" will be construed "must" when public interest and right demand it, and the public and third persons have a claim that the power should be exercised. *Veazie* v. *China*, 50 Maine, 518; *Blake* v. *Portsmouth*, 37 N. H. 435; *McKune* v. *Weller*, 11 Cal. 49; *Ex parte Banks*, 28 Ala. 28. Where the law imposes a duty upon individuals or a corporation, its performance or non-performance is never a matter of discretion upon the part of those upon whom the duty is devolved. Though the language of a statute is simply enabling, yet if it confers a power which concerns the public as well as individuals, it is not merely permissible but it is mandatory. *People* v. *Supervisors of New York*, 11 Abbott, 114. Certainly, the public and the individual stockholders are interested in the performance of the duty required of directors in section 9. And the word is "shall." In the 8th section, defining what the associations may do, among other things, "they may elect or appoint directors." The word "may" would be undoubtedly construed "must" in the light of the foregoing authorities. For a much stronger reason should the word "shall" be so construed in the 9th section. The law, wisely to obviate the necessity of an immediate election, permits the directors of the state bank, who are the active agents in the conversion, to act as the directors of the national bank until an election under their articles, but requires the same duties and qualifications as of directors selected by individuals forming an association under the act. The ten acting directors of the American Bank took the oath prescribed by section 9. The same, duly subscribed and certified by the officer before whom it was taken, was transmitted to the comptroller, and upon the faith

thereof the comptroller authorized the association to commence the business of banking. They, and they alone, could act in the affairs of the association as directors.

DURFEE, J. The defendants claim that the by-law in question was adopted by a quorum of the directors of the American National Bank on the two grounds: first, that there were only ten directors of the bank previous to its conversion; and, second, that the ten directors who executed the organization certificate and took the oath, became, under the United States law, the directors of the national bank, exclusively of any others.

1. The non-acting directors were elected with the other directors by the bank when a state bank. No subsequent qualification was required of them. They never signified their non-acceptance. The other directors never elected others to fill their places at the board. For anything we can see, they might have acted as directors at any time before the conversion, if they had chosen. Where no qualification is required and there is no usage to control, we think a person who is elected a bank director may be presumed to accept unless he declines. This presumption may doubtless be rebutted, and perhaps simple non-action for five months would be sufficient to rebut it in some cases. But in this case the stockholders who authorized the conversion recognized the non-acting directors as directors at the time of the conversion. They name them, in the instrument authorizing the conversion, with the other ten as those "*who are now* the directors of said American Bank." The instrument may be invalid in so far as it was intended to operate as a re-appointment, but considered as a recognition of the status of the non-acting directors, it is none the less significant. We think we ought not to find for the benefit of the bank that there were only ten directors previous to its conversion because of the simple non-action of these two, when the stockholders authorizing the conversion recognized these two with the other ten at the time they authorized the same.

2. The National Currency Act, section 44, prescribes the mode in which state banks may become national banks. It provides that "in such case, the articles of association and the organiza-

tion certificate required by this act may be executed by a *majority of the directors* of the bank or banking institution ;" that " the certificate shall declare that the owners of two-thirds of the capital stock have authorized *the directors* to make such certificate," &c. ; that " *a majority of the directors*, after executing said articles of association and organization certificate, shall have power to execute all other papers and to do whatever may be required to make its organization perfect and complete as a national association," &c., and that " *the directors aforesaid* may be the directors of the association until others are elected or appointed in accordance with the provisions of this act."

We think the words, " the directors aforesaid," mean those who were the directors of the state bank, the design being that the directors of the state bank should be the directors of the national bank until an election or appointment by the national bank. They are " the directors," a majority of whom are authorized by the section to do certain acts. This seems to us to be the natural construction, and we think of no good reason for not adopting it. We cannot suppose it was designed that the bank should lose the services of a director or of its president, merely because he did not sign the articles of association and the organization certificate ; for the omission may have been owing to a temporary sickness or absence. If the intention had been that those only of the directors of the state bank, who executed the articles and certificate, should be directors of the national bank, the intention would, we think, as it very easily could, have been more unmistakably expressed.

We also think that no oath was, by the act, required of these *ad interim* directors. Section 9 provides that " each director, *when appointed or electecd*, shall take an oath," &c. These directors were not elected or appointed for the interim, but held under the act by virtue of their former election. The 44th section says, " the directors aforesaid may be the directors of the association until others are elected or appointed in accordance with the provisons of this act." It adopts the directors of the state bank as the directors of the national bank for the time being. It makes no mention of any oath as being required of

them, and it might happen that some of the directors thus adopted, not being owners of the amount of stock required by the act, could not take the prescribed oath. And see Comptroller's Instructions, issued in 1864. page 9.

But even if the oath be necessary, it does not follow that a majority of only those who take the oath would constitute a quorum of the national board. On the contrary, we think it would still require, to make up such a quorum, a majority of " the directors aforesaid," *i. e.*, of those who were the directors of the bank before its conversion.

We consequently still feel constrained to adhere to our former opinion, that the twelve directors elected by the state bank became, by force of the National Currency Act, the directors of the national bank, and that, therefore, the by-law in question, being adopted by only six of them, was not adopted by a majority or quorum of the board, and so did not become a valid by-law. We therefore render,

*Judgment for the plaintiffs.*