FREDERIC E. TALBOT *et al. vs.* JEANNETTE A. TALBOT *et al.*

JANUARY 11, 1911.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1)  *Voluntary Trusts, Inter Vivos.*

In order to create a valid voluntary trust, *inter vivos,* where the donor is not trustee, there must be an intent to make a present transfer of ownership upon trust, and the donor must do everything that according to the nature of the property, is necessary to execute that intent.

(2)  *Trusts.  Completed Trusts.  Delivery.*

After death, executors found, in safe deposit of testator, certificates of stock, in name of testator, unendorsed; and also certain instruments, signed by testator, purporting to create trusts in various shares of stock by conveying same to trustees to pay the income therefrom to testator for life, and after his death to various beneficiaries.

Upon the question as to whether testator created valid trusts of these stocks:—
*Held,* that the two questions to be determined were; first one of fact, whether testator intended to make a present transfer of the stock to the trustees; and second, one of law, as to whether he did all that was necessary to transfer the ownership of the shares.

*Held,* that from the instruments themselves and from the facts in evidence, testator intended to create trusts in the shares to come into existence by means of and upon delivery to the trustees of the certificates and of the assignments.

*Held,* further, that, from the evidence, the several deliveries to one of the trustees of the certificates and assignments were sufficient to create a completed trust *in præsenti,* although there was at that time no delivery to the other trustees, and they were not notified of the creation of the trusts until after the donor's death, and that such delivery was all that was necessary to be done by the donor to transfer the ownership of the shares.

*Held,* further, that the facts that he did not endorse the certificates, that he received the dividends after the trusts were created, and that he did not inform but one of the four trustees, about the trusts, were not, upon the facts of the case, inconsistent with an intent to make a present delivery.

(3)  *Transfer of Stock.*

The printed form of transfer with power of attorney, upon a stock certificate, while it furnishes a convenient means of transfer, is not the only way in which it may be made. A transfer of ownership may be made by delivery of unendorsed certificates, together with specific assignments.

(4)  *Trusts in Præsenti.  Dividends.*

Where a settlor reserves a life interest, the receipt of dividends is not inconsistent with an intention to create a present trust.

(5)  *Trusts.  Intent.*

In determining the question of intention to create present trusts, the facts should be construed as strongly as possible in favor of the trust.

(6)  *Trusts in Præsenti.  Delivery.*

In attempting to create a present trust it is not important that, after delivering the assignment of the stock certificate to the trustee, the latter returned it to the donor, since a delivery is not defeated by a return of the instrument.

(7)  *Trusts.  Delivery.  Power of Revocation.*

A power of revocation contained in an assignment of certificates of stock in trust, does not affect the validity of the delivery or of the trusts thereby created.

(8)  *Trusts.  Delivery.*

Delivery to and acceptance by the trustee, or even knowledge of the trust on his part, are not essential to the validity of the trust as against the settlor, and the fact that the trustee declines to execute the trust does not defeat it or affect the rights of beneficiaries.

(9)  *Stock.  Delivery.  Gifts.  Trusts.*

Shares of stock are, or are in the nature of, choses in action which are represented by the certificates.

The delivery of such certificates with a written assignment, but without endorsement or registration, constitutes a valid gift.

(10)   *Trusts in Præsenti.*

A conveyance of stocks in trust is none the less present, because of the fact
    that one of the evident purposes of the trust was to secure a distribution of
    the property after the donor's death.

BILL IN EQUITY.   Certified to the Supreme Court under Gen.
Laws, cap. 289, § 35.

PARKHURST, J.   This cause is a suit in equity brought by
three of the executors of the will of Frederic Talbot, late of
Providence, deceased, for instructions relative to certain trust
deeds and to determine the ownership of certain shares of
capital stock of the Gorham Manufacturing Company, and of
the Silversmiths' Company, formerly owned by the testator.

The cause is before this court on bill, answers, and proofs,
having been certified for determination to this court by the
Superior Court, under cap. 289, § 35, Gen. Laws, 1909.

The bill names as defendants the beneficiaries of certain
deeds of trust, described in the bill, and also the beneficiaries,.
other than the complainants, of the residuary trust estate
created by Frederic Talbot's will.   The bill states that upon the
death of Frederic Talbot his executors found in his safe-deposit
box a certificate for seventy-five shares of the preferred stock
of the Gorham Manufacturing Company, and certificates for
twenty, ten, ten, and fifty-four shares, respectively, of the stock
of the Silversmiths' Company, standing in the name of the
testator and unendorsed, and also five instruments in writing,
signed by the testator, copies of which are filed with the bill,
which purport to declare and create trusts of seventy-five
shares of Gorham preferred stock and of twenty, ten, ten, and
fifty-four shares of Silversmiths stock, respectively, by con-
veying the same to trustees to pay the income therefrom to the
testator for life, and after his death to the above-named defend-
ants; that the trustees named in said instruments are the com-
plainants and the defendant, Martha Talbot, who also are the
trustees named in the residuary clause of the will; that the said
trustees, believing said instruments were legally binding upon
them and in full force and effect, caused transfers to be made of
the said stock to themselves as trustees, and now hold in their
possession, in place of the said certificates of stock, certificates

for like amounts in their names as trustees for the respective beneficiaries named in said instruments; that they now desire the opinion of the court as to whether the instruments are valid, and the trusts therein fully constituted, and as to whether they should hold said stock certificates under the trusts of the said instruments or under the residuary trusts of the will.

To this bill certain of the defendants, who are beneficiaries under the will, have filed an answer in which they deny that the testator delivered said certificates or said instruments to either of the trustees named in said instruments for the purpose of constituting a present trust, and allege that it was the intention of the testator that said instruments should not become operative or take effect until after his death. They pray that it may be decreed that the trusts were not fully constituted, and that the said certificates are a part of the residuary trust estate under the will.

Jeannette A. Talbot, C. Elizabeth Todd, Caroline L. Sanborn and Martha Talbot, the defendants who take life interests under said instruments, have also filed an answer to the bill, in which they allege that the testator delivered said certificates, and also delivered said instruments to Martha Talbot, one of the trustees therein named, for the purpose of creating the trusts therein set forth. They pray that it may be decreed that the trustees hold said certificates of stock upon the trusts contained in said instruments.

The material facts admitted in the pleadings or established by uncontradicted evidence are as follows: Frederic Talbot deceased on December 20, 1907. In the winter prior to his decease, he said to his wife, the defendant, Jeannette A. Talbot, that he intended to create for her a trust of seventy-five shares of Gorham preferred stock which would pay her $450 a year. Later, in the month of February, he produced a trust deed which he had composed and written, himself, and upon objection being made thereto by his son Charles, stated that he would take it to Mr. William R. Tillinghast and "have it made binding." Thereafter, on March 6th, he went to Mr. Tillinghast's office and executed, in his presence as witness, the instrument which is mentioned in paragraph seventh of the bill of

complaint (Complainant's Exhibit F.), and which purports to give, assign, and transfer to the above-mentioned trustees seventy-five shares of Gorham preferred stock, in trust, to pay the income to the grantor during his life, and upon his decease to pay the income to his wife, the respondent, Jeannette A. Talbot. He then came home much pleased, saying, "It is all right now, I have had it made binding," and handed Mrs. Talbot a copy and asked her to read it, which she did, comparing it with the original. Thereafter, on March 12th, he had a long conversation with his daughter, the respondent, Martha Talbot, regarding this trust, explaining to her that he had made this trust deed to give Mrs. Talbot the income of the seventy-five shares for life, and telling her that she and her brothers were the trustees. He than handed the trust deed to her, and said, "There, now, I have given that to you," and upon her asking what she should do with it, he told her to return it to him. He then asked Martha Talbot to call a witness, and in the presence of the witness executed the instrument which is mentioned in paragraph tenth of the bill of complaint. By this instrument the testator purports to sell, assign, and transfer, for value received, unto the said trustees, "seventy-five shares of the capital stock represented by the herewith attached certificates," and to thereby "irrevocably constitute and appoint" the said trustees his attorneys to transfer the said stock on the books of the Gorham Company. After executing this power of attorney, Frederic Talbot went with his wife to the Rhode Island Safe Deposit Company, and deposited the original trust deed and Mrs. Talbot's copy in a safe-deposit box, which stood in the joint names of Frederic Talbot and Martha Talbot, and in which he and Martha kept their valuables. This box originally stood in the joint names of Frederic Talbot and his brother's widow, but in 1904 was transferred to the names of Frederic and Martha Talbot. It remained in their names until Frederic Talbot's death, and still stands in the name of Martha Talbot. Before her name was added, Martha Talbot's papers, certificates, and other valuables were always deposited for her by her father, in this box. Afterwards, having free access to the box, she kept them there herself. She had no

other place to keep them. Mr. Talbot also kept his own valuables there, except such as were deposited in a safe at his home; and also certain possessions of his wife.

In this box Frederic Talbot deposited the aforesaid deed of trust, placing it and a certificate for seventy-five shares of Gorham preferred stock, to which was pinned the above-mentioned power of attorney, in an envelope upon which he wrote "Miss Martha Talbot, 67 Congdon St.," and also "Copy of Trust made to Martha, Fred E., Laurie H., and Ernest D. for Mrs. J. A. Talbot's life, after me 75 shs. Gor. Pfd. of which a copy is directed to her. Another envelope '*Note*' the 75 shares Gor. Pfd. stock is also herein enclosed." Mr. Talbot was accustomed to thus address to Martha envelopes which he deposited containing her property. The certificates which were thus deposited had formerly been kept in an envelope upon which Mr. Talbot had written, "This envelope of F. Talbot's contains 75 shares of preferred same." Mr. Talbot now wrote across the "75 shares" the words "withdrawn and put with trust."

Thereafter, in the spring of the same year, Frederic Talbot purchased a certificate for twenty shares of the capital stock of the Silversmiths Company, and told Martha that he was going to make a trust of those shares for his wife, in addition to the other trust. At about the same time he consented to exchange his Gorham common stock for Silversmiths stock, and before leaving the city for the summer arranged with the Gorham Company that he should leave his Gorham certificates, and that the Rhode Island Hospital Trust Company should receive the Silversmiths certificates for him and keep them until his return. During the summer he told Martha that as soon as he got the certificates he was going to have certain trusts made; that he had made a good investment by the exchange, and felt justified in taking the stock to make a trust for her and for Mrs. Talbot. He returned in September, and on September 25th asked Martha to go with him to the trust company to receive the certificates. At the trust company he receipted for the certificates, among which were certificates for the respective amounts of ten, ten, and fifty-four shares. Upon

receiving the latter he gave them separately to Martha.   They then deposited them in the above-mentioned safe-deposit box.   Thereafter, in October, Frederic Talbot went to a stenographer and had four trust deeds written, using as a form the above-mentioned trust deed of Gorham stock.   These four trust deeds are the ones mentioned in the third, fourth, fifth, and sixth paragraphs of the bill of complaint.   They purport to transfer and assign the respective shares of Silversmiths stock to the aforesaid trustees upon trust to pay the income to Frederic Talbot for life, and upon his death to the respective beneficiaries for life.   These beneficiaries are the respondents, Martha Talbot, Jeannette Talbot, Caroline L. Sanborn, and C. Elizabeth Todd.   (Complainant's Exs. B., C., D., and E.).   Mr. Talbot returned home with these deeds (not then executed), and told his wife and Martha what he had done and compared them with the first trust deed.   He then, on October 12th, asked Martha to "go down town with him and finish up the trust deeds."   They went together to the Rhode Island Hospital Trust Company, and there executed the instruments in the presence of Mr. Williams, who witnessed them.   As Mr. Talbot received each deed from Mr. Williams, he handed it to Martha, who received it and read it.   She then returned them to Mr. Talbot, and they went together to the safe deposit company.   Here Mr. Talbot took the certificates of stock out of the safe deposit box, laid them on the table, spread out the deeds of trust and compared them.   He then put each certificate and corresponding deed together and gave them to Martha.   When he had thus given them all to her, he told her that she was now trustee "with the boys," and further explained the deeds of trust to her.

Martha received these deeds of trust and certificates as trustee, and testifies that her understanding at the time was that her father had made her trustee with her brothers, and that the matter was finished.   Frederic Talbot then put the deeds into the above-mentioned envelope addressed to Martha Talbot, and added to what he had previously written thereon, "Also copy of trust made to same during life after me for 20 shares Silversmith; also copy of trust to yourself for 54 shares

of Silversmith; also trust to C. E. Todd and C. L. Sanborn of same." When this was done and he was putting the papers back into the box he seemed much relieved, and said, "Now, that is all finished now. There will be no trouble later on." The deeds and the certificates remained in the deposit box until Mr. Talbot's death, two months later.

It is admitted also that the deeds of trust were in the nature of a voluntary settlement; that all the certificates of stock, to which the deeds could apply, continued to stand in the name of the testator up to the time of his death; that neither of the certificates was endorsed in blank by testator or otherwise; that by the by-laws of the Silversmiths Company and the Gorham Manufacturing Company, the stock certificates were transferable only on the books of the company in person or by attorney on surrender of the certificates; that the deeds in no way identify the certificates to which the trusts relate; no specific shares were indicated either by a recital of the numbers of the certificates, or in whose name they then stood, or in whose possession they then were; nor were any certificates attached or annexed to the deeds of trust; but it appears that the several certificates for the respective amounts of stock named and transferred in the several trust assignments were laid out and placed with the respective assignments thereof; that after the execution of the trust deed relating to the Gorham preferred stock, March 6, 1907, dividends were paid on said stock on April 1st, July 1st, and October 1st, 1907; that all these dividends were paid directly to the testator as before, and deposited by him on his own account in the Blackstone Canal National Bank; that testator deceased December 20th, 1907; that after the execution of the trust deeds relating to the Silversmiths stock, October 12, 1907, the dividend on said stock, due November 15, 1907, was paid directly to the testator as before, and deposited by him on his own account in the Rhode Island Hospital Trust Company; that no one outside of the testator's household knew of the execution of the trust deeds; that the testator's three sons, who were trustees under the deeds, knew nothing about them until after their father's death.

Mr. Talbot placed in the safe deposit box a memorandum

on which he wrote, "Memo, showing whereabouts of securities,. &c., of my own, Mrs. T.'s and Martha's, March, 1907." This memorandum, after enumerating the whereabouts of certain articles, adds, "also my will and trust for Mrs. T. life lately created (in March, '07), securing life income of $7,500." He also deposited in the box another memorandum, which reads as follows:

    "Memo.    PROV., March 8, 1907.

"Referring to the Legacies to my Wife as stated in my Will dated Feb. 1, 1901; the amounts named therein are not all I intended to assign. Therefore three years later I gave her ten (10) Shares of Gor. Mfg. Co. Common Stock, the income of which ($100 per ann.) she has received and invested. In addition to this I have just now created a Trust of the Income of 75 shares of Gorham Mfg. Co. Preferred Stock, during her life after my death.

"The trustees of this are yourselves.

     "Affectionately,

      "(*Signed*)  FREDERIC TALBOT.

"To Martha Talbot,

 "Fred E. Talbot,

 "Laurie H. Talbot,

 "Ernest DeW. Talbot.

"Memo.         October, 1907.

"The above-named shares of the Gor. Com. Stock having been exchanged for the Silversmiths Co. Stock at a premium, Mrs. Talbot has received 21 shares of that in lieu of the Gor. Common.

"In addition to this I have now created another trust, giving her the income, during her life, of 20 Shares more of the Silversmiths Co. after my death.

"This makes up a fair share of income of the whole estate.

   "(*Signed*)    FREDERIC TALBOT."

Mr. Talbot, also, on October 14, 1907, wrote in a letter addressed to his wife, "I have created trusts for my daughter and sons to pay you the income of 75 shares, $7,500, Gorham Manufacturing preferred stock, and income of 20 shares, $2,000, of Silversmiths' stock during your life."

After Frederic Talbot's death the above-mentioned certificates for seventy-five shares of Gorham preferred stock were transferred to and now stand in the names of "Martha Talbot, Frederic E. Talbot, Laurie H. Talbot and Ernest D. Talbot, trustees under the trust deed of Frederic Talbot," and the certificates for the twenty, ten, ten, and fifty-four shares of Silversmiths stock were transferred to and now stand in the names of the said Martha, Frederic, Laurie and Ernest, trustees for Jeannette A. Talbot, Caroline L. Sanborn, C. Elizabeth Todd, and Martha Talbot, respectively. Since then the trustees have received the dividends from this stock and have paid to the beneficiaries, out of the estate, by agreement, an amount equal to the dividends thus received.

The will of Frederic Talbot devises and bequeaths all the residue of his estate, after payment of certain bequests, to Martha Talbot, Frederic E. Talbot, Laurie H. Talbot, and Ernest DeW. Talbot, upon trust to pay the net income therefrom to his children or issue during a period for ten years, from the testator's death, or during such longer period as a majority of said children at the end of ten years shall determine and shall declare by a certificate in writing filed in the Municipal Court. The will, after making provision for widows of deceased sons, further provides that, at the end of said ten years or longer period, the trustees shall stand seized of the trust estate for the issue of the testator's four children, and, in default of issue, for his heirs at law.

Two of the complainants have children and a third is married. The defendant, Martha Talbot, is unmarried.

Upon these facts the question before the court is whether Frederic Talbot created valid trusts of these stocks.

It is contended by counsel for the complainants and for certain respondents, who are interested, by virtue of the residuary provisions of the will, adversary to the interests of the beneficiaries under the specific trusts created or attempted to be created under the five several instruments of assignment and transfer of these five several groups of corporate stocks, that it was the manifest intention of Frederic Talbot to create an active trust in the persons named in the instruments as

trustees, and that said instruments can in no way be construed as importing any intention on his part to make himself a trustee as by a declaration of trust; and this contention is not disputed by any party.

And it is further contended that the settlor did not do all that was necessary to be done in order to transfer the stock, to divest himself of all interest therein, and to create *in præsenti* the relation of trustee and *cestui;* that, the settlement being voluntary and the trust incomplete, equity will not enforce it, nor aid in perfecting it; and that the circumstances indicate a purpose on the part of the settlor to make a testamentary disposition of the stock.

In support of the above contentions, that the settlor did not do all that was necessary to be done in order to transfer the stock, to divest himself of all interest therein and to create *in præsenti* the relation of trustee and *cestui que trust,* and that, the settlement being voluntary and the trust incomplete, equity will not enforce it, nor aid in perfecting it, counsel cites and relies upon the case of *Milroy* v. *Lord,* 4 De. G. F. & J. 264 (1862). There a settlor by a deed poll conveyed and transferred " fifty shares of the capital stock of the Bank of Louisiana, now standing in my name in the books of the said bank, together with the certificates or scrip thereof, numbered 3,457 and dated the 6th of March 1852," to Samuel Lord, "in trust to collect and receive the dividends and profits of the said stock, and apply them to the use and benefit" of Eleanor Milroy. Lord accepted the trust, signed the deed, held the certificates of stock, collected the dividends and paid them to the beneficiary. Lord also had a general power of attorney from the settlor to transfer the shares of stock, but no transfer upon the corporate books was ever made, nor was the old certificate ever surrendered to the corporation, nor any new certificate isssued to the trustee. After the death of the settlor, upon a bill to recover the stock, it was held that the voluntary settlement was not perfected. Counsel claims that this case is directly in point, and quotes from the opinion of Lord Justice Turner, as follows (p. 274): "I take the law of this court to be well settled, that in order to render a voluntary settlement valid

and effectual the settlor must have done everything which, according to the nature of the property comprised in the settlement, was necessary to be done in order to transfer the property, and render the settlement binding upon him. He may, of course, do this by actually transferring the property to the persons for whom he intends to provide, and the provision will then be effectual, and it will be equally effectual if he transfers the property to a trustee for the purposes of the settlement, or declares that he himself holds in trust for those purposes; and, if the property be personal, the trust may, as I apprehend, be declared either in writing or by parol; but, in order to render the settlement binding, one or other of these modes must, as I understand the law of this court, be resorted to, for there is no equity in this court to perfect an imperfect gift. The cases, I think, go further to this extent, that if the settlement is intended to be effectuated by one of the modes to which I have referred, the court will not give effect to it by applying another of those modes. If it is intended to take effect by transfer, the court will not hold the intended transfer to operate as a declaration of trust, for then every imperfect instrument would be made effectual by being converted into a perfect trust. These are the principles by which, as I conceive, this case must be tried."

This is the only English case cited (save one) wherein the transfer of corporate stock is dealt with; and it appears to settle the English law to the effect that, in order to make a trust settlement of corporate stocks complete and effectual, although the shares of stock have been actually assigned to the trustee and the certificates handed over to him, and he has collected the dividends thereon and paid them over to the *cestui que trust,* yet the trustee must also have surrendered the certificates to the corporation and must have had the shares transferred to and registered in his name as trustee on the books of the corporation, and must have taken out new certificates in his own name as trustee.

In the case of *Heartley* v. *Nicholson,* 19 L. R. Eq. 233, 242, cited by complainants' counsel, which approves the doctrine of *Milroy* v. *Lord* (*supra*), it appeared that a testator, by letters and other acts, expressed a desire and intention that the plain-

tiff should have certain shares of stock as her property, but failed to carry out his intention by making any actual transfer in his lifetime; and that he never had made any declaration of trust, and that the circumstances did not amount to proof of an intention and determination on his part that he would hold the shares which he had meant to transfer to the plaintiff in trust for her.

The other English cases cited by the counsel for the complainants on this point, while they approve and follow the general doctrine of *Milroy* v. *Lord*, have no relation to transfers of corporate stocks.   *Richards* v. *Delbridge*, L. R. 18 Eq. 11, related to an attempted gift of a leasehold interest and stock in trade by means of a mere memorandum endorsed upon the lease: "This deed and all thereto belonging I give to E. from this time forth, with all the stock-in-trade." The lease was then delivered to E's mother on his behalf; and it was held that there was no valid declaration of trust in the property in favor of E.   *Warriner* v. *Rogers*, L. R. 16 Eq. 340, related to an attempted gift of a box and contents, with a note inside not read by the donee (plaintiff); the donor kept the key of the box and told the donee not to open it till after her death.   She afterwards made her will, whereby she gave the residue of her real and personal estate to the defendant, a stranger in blood. After her death the box was opened and found to contain a paper writing dated and signed by testatrix, and addressed to the plaintiff, to the effect that the contents of the box were a deed of gift to the plaintiff of certain real and personal estate therein specified and described, &c., &c.,   It was held that the papers were of a testamentary character and did not amount to a valid declaration of trust in favor of the plaintiff.   *In re Breton's Est.* L. R. 17 Ch. D. 416, related to a supposed gift, to a wife, of furniture, &c., where the evidence offered to support the gift consisted of three letters of the husband to the wife, purporting to give her furniture, plate, &c., without any delivery of the chattels, which were a part of their household furniture, and always used by them in common in the ordinary ways; it was held that there was no completed gift.   These cases refer to *Milroy* v. *Lord, supra,* and rest upon the general doctrine

therein set forth, but have no special bearing upon the case at bar.

The general doctrine, as applied to incomplete or executory settlements in trust, set forth in *Milroy* v. *Lord, supra,* was cited with approval in the case of *Paine* v. *Paine,* 28 R. I. 309, 310; in that case it appeared that the complainant's father had at one time, just after the plaintiff attained his majority, written to him a letter, in which he said, "Your mother's stock in the Akerman Company I have retained in such manner that the income goes to me, but so that neither your creditors can get it if you meet with disaster—nor can my creditors touch it if I am unsuccessful;" that thereupon, on the same day, the father transferred certain shares of stock in the Akerman Company, which had been the individual property of complainant's mother, so that they stood upon the books of the company as follows: "George T. Paine, Atty. for W. H. Paine." But no certificate of the same was ever issued to the complainant (W. H. Paine), and he had no knowledge that the stock had ever been so transferred till after his father's death. Later on, George T. Paine made other transfers of the same stock, so that for several years prior to and at his death it stood in his own name; and meanwhile he always voted on the stock and collected the dividends thereon and applied them to his own use. It further appears that, several years prior to his death, an estrangement occurred between father and son, and that the father wrote to his son as follows: "I have no funds of any kinds in my hands belonging to you in trust or that have accumulated for your benefit from your mother's estate." It was perfectly plain, therefore, that no trust in the stock of the Akerman Company had ever been created by the father in favor of his son, and the bill to establish such a trust was properly dismissed. It is also quite evident that the approval by this court of the general doctrine of *Milroy* v. *Lord, supra,* falls far short of an approval of its application to the state of facts set forth in *Milroy* v. *Lord,* and furnishes no argument for its application to the facts of the present case.

The complainant's counsel cites no cases from the courts of this country where the doctrine of *Milroy* v. *Lord, supra,* has

been supported and followed, to its fullest extent; and we have found no such cases cited in any of the elaborate briefs submitted in behalf of the other parties. The general principle of all the cases, both English and American, is unquestionably the same, that in order to create a valid, voluntary trust *inter vivos,* where the donor is not trustee, there must be an intent to make a present transfer of ownership upon trust, and the donor or settlor must do everything that, according to the nature of the property, is necessary to execute that intent. And this rule is well stated and fully recognized in *Peoples Savings Bank* v. *Webb,* 21 R. I. 218, 219, where the rule is thus stated: "The underlying question, both in trusts and gifts, is the intention and act of the donor. Hence we find the same general rule in both classes of cases. There must be a present intent to make a trust or gift at the time; there must be an execution of the intent by some act, such as delivery of the evidence of title, or a notice and acceptance of the trust, and the intent and act must be such as to give a present right or benefit to the donee." And see *Paine* v. *Paine,* 28 R. I. 307, 309, *supra.* And in *Stone* v. *Hackett,* 12 Gray, 227, 230, Judge Bigelow states the same general rule as follows: "The key to the solution of

(2) the question raised in this case is to be found in the equitable principle, now well established and uniformly acted on by courts of chancery, that a voluntary gift or conveyance of property in trust, when fully completed and executed, will be regarded as valid, and its provisions will be enforced and carried into effect against all persons, except creditors or *bona fide* purchasers without notice. It is certainly true that a court of equity will lend no assistance towards perfecting a voluntary contract or agreement for the creation of a trust, nor regard it as binding so long as it remains executory. But it is equally true that if such an agreement or contract be executed by a conveyance of property in trust, so that nothing remains to be done by the grantor or donor to complete the transfer of title, the relation of trustee and *cestui que trust* is deemed to be established, and the equitable rights and interests arising out of the conveyance, though made without consideration, will be enforced in chancery."

From these authorities it is evident that we must first determine the question of fact whether Frederic Talbot intended to make a present transfer of the Gorham and Silversmiths stock to the trustees. We must then determine the question of law whether what he did was all that was necessary to transfer the ownership of shares of stock. We will consider these questions separately.

At this point it is important to consider the exact form in which the five assignments to the trustees were made:—the assignment of the Gorham preferred stock is as follows:

"(Complainants' Exhibit F.)

"KNOW ALL MEN BY THESE PRESENTS:

"That I, Frederic Talbot, of the city of Providence, and State of Rhode Island, in consideration of the sum of one dollar to me paid by Martha Talbot, Frederic E. Talbot, Laurie H. Talbot and Ernest D. Talbot, all of said Providence, the receipt whereof is hereby acknowledged, and of the trusts hereinafter contained, have given, assigned and transferred and by these presents do give, assign and transfer unto them, the said Martha Talbot, Frederic E. Talbot, Laurie H. Talbot and Ernest D. Talbot, in trust as hereinafter provided:

"Seventy-five (75) shares of the preferred capital stock of the Gorham Manufacturing Company of said Providence:

"To HAVE AND TO HOLD the said shares of stock unto them, the said Martha Talbot, Frederic E. Talbot, Laurie H. Talbot and Ernest D. Talbot, and the survivors and survivor of them and other the trustee or trustees who may at any time be appointed to carry out the trusts hereunder, all hereinafter referred to as my said trustees, in trust to hold said shares of stock and collect all the income and dividends thereof and after paying therefrom any taxes or other public charges and any necessary expenses of carrying out these trusts, to pay the residue thereof, hereinafter called the net income, to me, the said Frederic Talbot as often as any dividends are declared upon said stock, during my life; and from and after my decease to pay said income in manner aforesaid to my wife Jeannette A. Talbot, during her life; but if my said wife should die before me, then all the trusts hereinunder shall cease and determine and

said shares of stock shall revert and be reassigned and transferred to me as my absolute property; and upon the death of my said wife, if she shall survive me, in further trust to hold said shares of stock subject to and as a part of the trust property subject to any trusts of the residue of my estate created by my last will and testament, if any such trusts shall so long continue; and if at that time the trusts of the residuary estate under my said will shall have terminated or if for any other reason no such trusts shall then be in force, then to divide said shares of stock equally between my four children, the said Martha Talbot, Frederic E. Talbot, Laurie H. Talbot and Ernest D. Talbot, as their own absolute property. Provided, however, and I hereby expressly reserve to myself the power during my life by any writing under my hand delivered to said trustees or the survivors or survivor of them, to revoke this instrument and all the trusts hereunder whereupon said shares of stock shall revert and be retransferred to me as my absolute property; and I also expressly reserve the right to modify or change the trusts and limitations hereunder in any manner I see fit:

"And I hereby grant to my said trustees power to sell said shares of stock and my reinvestments thereof and reinvest the proceeds thereof in good income producing securities, and no purchaser shall be required to see to the application of the purchase moneys; provided, however, no such sale shall be made during my life without my consent in writing, and provided further, and I hereby reserve the right during my life to direct in writing my said trustees to sell said shares or any reinvestment thereof and to invest the proceeds in other securities to be then named by me.

"IN TESTIMONY WHEREOF, I have hereunto set my hand this Sixth day of March, A. D. 1907.

"FREDERIC TALBOT.

"Executed in the presence of,
"WM. R. TILLINGHAST,
"ARTHUR A. THOMAS."

The four trust assignments of the Silversmiths Co. stock were in precisely the same form, but dated October 12, 1907.

It is evident from the reading of these assignments, and from

the foregoing statement of facts, that Frederic Talbot intended to create trusts of the Gorham and Silversmiths stocks. The sole question of intention is whether he intended to create them by a conveyance *in præsenti* or *in futuro*.

The provisions of the trust instruments show that Frederic Talbot intended the trusts to come into existence at some period during his lifetime. These instruments provide that the trustees pay the net income to Frederic Talbot for life, and, after his death, to his wife for life. They further provide that, in the event of the prior decease of his wife, the stock shall revert to him, and also that during his lifetime he may revoke the instruments and all trusts thereunder, or may change or modify the trusts, and that no sale shall be made, during his life, without his consent. These provisions are not consistent with an intention to make a testamentary disposition.

The question then arises, at what period of his life did he intend the trusts to come into existence? The facts, which are stated in detail above, show that he had done everything that he thought necessary to create the trusts, and intended that they should be completely constituted by means of and upon the delivery to the trustees of the certificates and of the assignments.

We will first consider the facts as to the trust for seventy-five shares of Gorham preferred stock. The most important of these facts are the following: Frederic Talbot declared to his wife his intention of making a trust for her of this stock, and drafted an instrument for that purpose. Later he became dissatisfied with this instrument, and went to a lawyer to "have it made binding," as he expressed it. He returned, bringing with him the trust instrument (Complainant's Ex. F.), which he had executed in the presence of two witnesses, which purports to give, assign, and transfer this stock to the trustees. He was much pleased, and said, "It is all right now, I have had it made binding," and gave Mrs. Talbot a copy, which they compared with the original. Thereafter he explained the matter fully to his daughter, Martha, stating that he had made the trust deed to give the income from the Gorham stock to his wife for life, and that Martha was one of the trustees with her brothers.

He then handed the instrument to her, saying, "There, now, I have given that to you." He also wrote out a power of attorney to transfer this stock upon the books of the company, which he executed in the presence of a witness. He then went to the safe-deposit box, withdrew the certificates for seventy-five shares from an envelope containing his own stock, made a memorandum on the envelope that they were "withdrawn and put with trust," and pinned the certificates to the power of attorney. These he placed with the assignment in an envelope, which he addressed to Martha, and on the outside endorsed a memorandum that it contained the "trust" and the certificates. He was accustomed thus to address envelopes in which he deposited Martha's property. This envelope he deposited in the safe deposit box, which stood in their joint names and to which Martha had access. He was accustomed to deposit Martha's valuables in this box for her. He then made and deposited in said box a memorandum, addressed to said trustees, that he had "just now created a trust" of this stock for his wife "during her life after my death;" and he also declared in another memorandum, and in a letter written to his wife, that he "had created" this trust for her life. These facts show that he intended to make a present delivery of these instruments and certificates. His declarations of intention to create the trust, and later his declarations that he had created it, show such intent. Thus in *Atkinson, Petitioner*, 16 R. I. 413, the creator of certain trusts, who was himself trustee, declared to the beneficiaries that he had made deposits for them, and that the money would be theirs at his death. The court said: "The declaration of the trustee to the beneficiaries as above stated shows that he understood it to be completely constituted." The declaration in the present case, that Frederic Talbot had "just now created a trust of the income . . . during her life after my death" shows clearly that he "understood it to be completely constituted." So also in *Hani* v. *Germania Life Ins Co.*, 197 Pa. St. 276, 278, an intention to deliver was gathered from declarations of intention before handing over, and from subsequent declarations, that the grantor had given the property. The evident desire of Frederic Talbot to make the instrument immediately bind-

ing, coupled with his acts of delivery, also indicate such intent; as do the facts that he took the trouble to execute a power of attorney and to explain the trust deed to Martha before giving it to her, and that upon giving it to her he used the significant words of delivery, "There, now, I have given that to you." That he intended also to deliver the certificates is shown by the fact that he withdrew them from his own property and placed them in the envelope addressed to Martha, together with the instrument which he had already given to her and the power of attorney. When we consider that he had already handed to her the deed of assignment of this stock, which he put with the certificates; that in depositing the certificates in an envelope so addressed he was following his usual custom in depositing Martha's property; and that the box in which they were deposited stood in her name and was the place where she kept all her valuables, the intent to deliver is apparent. See *Gilkinson* v. *Third Ave. R. R. Co.*, 47 N. Y. App. Div. 472, where the question was whether stock certificates had been delivered to an alleged donee. The donor had procured a safe-deposit box, placed the certificates in it, and given a key to the donee, keeping one himself. The court held that this showed an intent to make a delivery of the certificates and that the delivery was valid. See also *Reed* v. *Copeland*, 50 Conn. 472, 476, 487; *Devol* v. *Dye*, 123 Ind. 321; *Candee* v. *Conn. Savings Bank*, 81 Conn. 372.

The important facts relating to the Silversmiths stock are as follows : Mr. Talbot, after acquiring these shares, declared his intention of creating these trusts. In the spring of 1907 he bought twenty shares, and, later in the same year, upon conversion of this Gorham stock, received, among others, certificates for ten, ten, and fifty-four shares. These certificates he gave separately to Martha, and they deposited them in the safe-deposit box. Thereafter he had the assignments made, and executed each of them before a witness and handed each to Martha. They then went to the safe-deposit company, where Mr. Talbot took out the certificates, put the corresponding assignments and certificates together and gave them separately to Martha, carefully explaining them. He then

put the assignments into the above-mentioned envelope, addressed to Martha, and made further note thereon that it now contained copies of these trusts. When he had done this, he told her that she was now trustee "with the boys," that it was all finished now, and there would be no trouble later on. Martha received these assignments and certificates as trustee, and testifies that her understanding was that her father had made her trustee with her brothers. Thereafter he added to the above memorandum the words: "In addition to this I have now created another trust giving her the income, during her life, of 20 shares more of the Silversmiths' Co. after my death." And in a letter to Mrs. Talbot he again stated that he "had created" these trusts. Upon these facts it is clear that he also intended to create trusts of this stock by a present delivery of the certificates and instruments. Here again are declarations of intent to create, and of the fact of creation. His intent is also shown by the separation of these certificates from his others, and the delivery to Martha. It is also shown by the fact that he had assignments made for them and upon execution handed each to Martha; that later, after careful explanation, he put the corresponding certificates and assignments together and handed them to her, and that he put the assignments into her envelope. See *Bank* v. *Holland*, 99 Va. 495; *Larimer* v. *Beardsley*, 130 Ia. 706.

The complainants and certain beneficiaries under Frederic Talbot's will contend, however, that he did not intend a present delivery because he did not endorse the certificates, because he received the dividends after the trusts were created, and because he did not inform the other trustees of the trusts. These facts, however, are not inconsistent with an intent to make a present delivery. Under some circumstances they might be evidence of an intent to retain the property, but not upon the facts of the present case. Thus the lack of endorsement does not show such intent, since an endorsement is not necessary to make trustees owners of stock. The printed form (3) of transfer, with power of attorney, commonly placed upon the back of a stock certificate, furnishes a convenient and appropriate means of transfer in the ordinary course of business;

but it is by no means the only way in which a transfer of stock may be made. A transfer of ownership may be made by a delivery of unendorsed certificates, together with specific assignments, as well as by delivery of endorsed certificates. And where stocks are to be transferred upon express trusts, as here, it is certainly more convenient and orderly that such transfers should be made by separate specific assignments in trust, so that the trusts may be fully set forth. The fact that he did not attempt to transfer ownership by delivery of endorsed certificates is not evidence that he did not intend to do so by delivery of unendorsed certificates.

Again, as regards the receipt of dividends. The fact that he received the dividend checks directly from the companies, after delivery of the certificates and assignments, during the short period before his death, resulted solely from the fact that no transfer had been made upon the books by the trustees. Since by the terms of the trusts themselves he was to receive the dividends during his life, it was immaterial whether he received them from the trustees or from the companies. Had he sought to create the trusts without executing the trust instruments, or delivering the certificates, or if, by the terms of the trusts, others were to receive the dividends during his life, the receipt of dividends from the company by himself would be evidence that he did not regard the settlement as complete. The authorities hold, however, that, where a settlor reserves a life interest, the receipt of dividends or use of the trust property is not inconsistent with an intention to create a present trust. See *Stone* v. *Hackett*, 12 Gray, 227; *Candee* v. *Conn. Savings Bank*, 81 Conn. 372; *Bank* v. *Holland*, 99 Va. 495; *Larimer* v. *Beardsley*, 130 Ia. 706; *Hackett* v. *Moxley*, 65 Vt. 71; *Reed* v. *Copeland*, 50 Conn. 472; *McNally* v. *Mc Andrew*, 98 Wis. 62.

Furthermore, the fact that he did not inform the other trustees loses whatever significance it might otherwise have had when we consider that the other trustees were not beneficiaries, and that the one trustee who was a beneficiary was informed with the greatest care, and understood and accepted the trust. Frederic Talbot also informed his wife, another

beneficiary, and gave her a copy of the instrument in her favor. His sons had no beneficial interest in the trust, were busy, were seldom consulted by their father, and did not live at home. Frederic Talbot was of advanced years, and executed the trusts shortly before his death. Whether he intended Martha to inform the other trustees, or whether he intended to do so himself, we can only conjecture. It is clear that in any event he intended them to learn of the trusts, for he addressed to them a memorandum that he had created the trusts. In view of the full information which he gave the trustee beneficially interested in the trust, it is of little importance that he failed to inform immediately the other trustees, who had no beneficial interest, especially as notice to the other trustees, or delivery to them or acceptance by them was not necessary to the creation of a complete trust. Thornton, Gifts and Advancements, § 426; 28 Am. & Eng. Enc. of Law, 896, (d) and cas. cit; *Fletcher* v. *Fletcher*, 4 Hare. 74; *Minot* v. *Tilton*, 64 N. H. 371, 375; *Cloud* v. *Calhoun*, 10 Rich. Eq. (S. C.) 358, 362; *Adams* v. *Adams*, 21 Wall. 185.

(5)    In determining this question of intention, the facts should be construed as strongly as possible in favor of the trusts. The purpose of the testator to benefit these defendants, being undisputed, should be given effect to in the absence of clear evidence that he did not intend to do so by present trusts. See *Devol* v. *Dye*, 123 Ind. 321, 328 (*supra*); *Otis* v. *Beckwith*, 49 Ill. 121, 135; *Bond* v. *Bunting*, 78 Pa. St. 210, 219.

Especially is this a case meriting the application of this rule, since a failure of the trusts will defeat the provision which Mr. Talbot intended to make for his wife and for his daughter Martha, and for the other beneficiaries during their lives. It will also deprive his daughter, Martha, of her remainder interest in the stocks included in the other trusts.

It is shown beyond a doubt, by the above recited facts, that Frederic Talbot intended to transfer the shares of stock by making a present delivery of the certificates and assignments to the trustees. It remains to consider, first, whether his acts in execution of this intent amounted to a legal delivery of the certificates and assignments to the trustees; and, second,

whether a legal delivery to the trustees, with such intent, of unendorsed certificates and assignments, without transfer on the books of the company, is all that is necessary for a transfer of ownership of shares of stock. With the intent, just considered, of making a present delivery, he did the following acts: He handed the assignment of the seventy-five shares of Gorham stock to Martha; he separated the certificate for these shares from his own stock and placed it with the assignment in an envelope, addressed to Martha, which he deposited, according to his custom in depositing her property, in a safe-deposit box, which stood in their joint names; he also handed to her the several certificates and several assignments for the respective number of shares of the Silversmiths stock; and these were likewise deposited in the same box. In the case of the assignments and of the Silversmiths certificates there was a manual delivery to Martha. In the case of the Gorham certificate there was also a delivery to her by the deposit among her possessions. See *Gilkinson* v. *Third Ave. R. R. Co.*, 47 N. Y. App. Div. 472 (*supra*), where it was held that a deposit of stock certificates in a safe-deposit box, to which both the donor and donee had access, was a valid delivery. And see *Reed* v. *Copeland*, 50 Conn. 472 (*supra*); *Devol* v. *Dye*, 123 Ind. 321 (*supra*); *Candee* v. *Conn. Savings Bank*, 81 Conn. 372 (*supra*); *Martin* v. *Flaharty*, 13 Mont. 96. In this connection the fact is not of importance that after delivering the assignment of the seventy-five shares to Martha she handed it back, since a delivery is not defeated by a return of the instrument to the donor. *Stone* v. *King*, 7 R. I. 358; *Grover* v. *Grover*, 24 Pick. 261; *Royston* v. *McCulley*, 52 L. R. A. 899 (Tenn.); *McNally* v. *McAndrew*, 98 Wis. 62; *Larimer* v. *Beardsley*, 130 Ia. 706, 709; 14 Am. & Eng. Ency. Law, 1026, 1027. And the power of revocation contained in the assignments does not, of course, affect the validity of the delivery or of the trusts thereby created. *Stone* v. *Hackett*, 12 Gray, 227; *Van Cott* v. *Prentice*, 104 N. Y. 45; *Keyes* v. *Carleton*, 141 Mass. 45, 49.

These several deliveries to Martha as trustee were sufficient to create in each instance a completed trust *in præsenti*, although there was at that time no delivery to the other trustees

and they were not notified of the creation of the trusts until after the donor's death. "In general, delivery to and acceptance by the trustee, or even knowledge of the trust on his part, are not essential to the validity of the trust as against the settlor, and the fact that the trustee declines to execute the trust does not defeat it or affect the rights of beneficiaries." 28 Am. & Eng. Enc. of Law, p. 896, d. and cases cited. *Fletcher* v. *Fletcher*, 4 Hare, 74; *Minot* v. *Tilton*, 64 N. H. 371, 375; *Cloud* v. *Calhoun*, 10 Rich. Eq. (S. C.), 358, 362, and cases *infra*. And in case the trustee refuses to accept or execute the trust, the court will appoint a new trustee or trustees for that purpose. *Adams* v. *Adams*, 21 Wall. 185; *Stone* v. *King*, 7 R. I. 358; *King* v. *Donnelly*, 5 Paige (N. Y.), 46. See also Thornton on Gifts and Advancements, § 426; Devlin on Deeds, § 260. And it is to be noted here that the three other trustees, upon being notified of these trusts after their father's death, did not decline to accept or refuse to execute the trusts, but forthwith proceeded to have the several blocks of stock transferred to their own names as trustees, surrendering the old certificates and taking out new ones in their names as trustees, which they have ever since held.

There can be no doubt, under the course of decisions in this country, that the delivery of the certificates of stock, together with the assignments thereof in trust to the trustees, as hereinbefore set forth, was all that was necessary to be done by the donor to transfer the ownership of the shares of stock. Shares of corporate stock are *choses in action*, or in the nature of *choses in action*, as was recognized in this State in *Arnold* v. *Ruggles*, 1 R. I. 165, 174; *Dyer* v. *Osborne*, 11 R. I. 321, 326; and see other cases *infra*. The certificates are the evidence representing the *choses in action*. *Burrall* v. *Bushwick, R. R. Co.*, 75 N. Y. 211; *Commonwealth* v. *Crompton*, 137 Pa. St. 138; *Leyson* v. *Davis*, 17 Mont. 220.

The question to be determined is whether a delivery of such evidence of title with a written assignment, but without endorsement and without registration, constitutes a valid gift. In *Tillinghast* v. *Wheaton*, 8 R. I. 536, the court was asked to determine whether a delivery of a savings bank book, with

words of gift, constituted a valid gift *causa mortis* of the deposit
evidenced by the bank book.    In holding the gift valid, Judge
Durfee said, p. 541:  "It has been uniformly held that bank
notes, notes payable to bearer, and other securities and evi-
dence of indebtment, which are transferable by mere delivery,
may pass as gifts *mortis causa;* but in *Miller* v. *Miller*, 3 P.
Wms. 356, it was decided that a note of hand, not payable to
bearer, and being a mere chose in action to be sued in the name
of the executor, was not the subject of a *donatio causa mortis.*
In *Ward* v. *Turner*, 2 Ves. Sen. 431, it was held by Lord Hard-
wicke that a gift of receipts for South Sea Annuities was not a
good *donatio causa mortis*, principally because the property did
not pass by a delivery of the receipts, but a transfer was neces-
sary, which was not made.    The doctrine of these decisions has
been recognized and approved in other English and in some
American cases.  . . .  But in the more recent English
decisions the strictness of the ancient rule has been much
relaxed, and it is stated by Mr. Redfield, who seems to have
had access to all the later cases, that it is ' now fully settled in the
English courts that not only are all securities which pass by
delivery or by endorsement, when endorsed in blank, the sub-
jects for a valid gift *mortis causa*, but that, even promissory
notes and bills not negotiated so as to pass by delivery, and also
promissory notes not negotiable, bonds, mortgages, policies of
insurance, and all other evidences of indebtedness which may
be regarded as representing the debt, may, by a parol gift, and
the delivery of the paper by which the debt is evidenced, either
with or without written assignment or endorsement, constitute
a good gift *mortis causa.*'    2 Redfield on Wills, pp. 312, 313,
and cases there cited.    The rule thus educed from the English
authorities has been repeatedly recognized and applied by the
American courts."    This case, which is widely cited, is affirmed
in *Prov. Inst. for Savings* v. *Taft*, 14 R. I. 502.    There a deposi-
tor in the plaintiff bank owned two deposits,—one in his own
name and one in the name of his sister.    These deposits were
evidenced by bank books which were in the custody of the
depositor's mother.    The depositor declared to his mother that
he gave her the two books, and left them in her possession.    The

court held that there had been a valid gift *inter vivos* of the money on deposit.

In *Hopkins* v. *Manchester*, 16 R. I. 663, the question was whether a delivery of an unendorsed promissory note constituted a valid gift *inter vivos*. The court of Common Pleas held that such a note would not pass by delivery, without endorsement, as a gift *inter vivos*, though it might as a gift *causa mortis*. This decision was overruled upon exception. The court said, p. 664: "The modern cases hold that such a note or at least the beneficial interest in such a note, will pass by gift, without indorsement, so as to entitle the donee to collect the money due on it for himself, and, if need be, to sue on it for himself, in the name of the donor, or of the donor's legal representative. We do not find that the cases distinguish in this respect between gifts *inter vivos* and gifts *causa mortis*, though it may be that, in a doubtful case, the jury would regard the want of an indorsement with more suspicion if the gift were *inter vivos* than if it were *causa mortis*."

We are of the opinion that the principle of these cases, that the delivery of the instrument which is the evidence representing a *chose in action*, constitutes a valid gift, should be applied to the delivery of a certificate of stock. Although the question has not heretofore been determined in Rhode Island, the decisions in other jurisdictions of this country are almost unanimous in holding that such delivery, either with or without written assignment or endorsement, and without registration on the books of the corporation as required by its by-laws and certificates, constitutes a valid gift,—whether it be to trustees or directly to the beneficiaries, and whether it be *inter vivos* or *mortis causa*. And it is even held that a delivery of an assignment without delivery of the certificate and without registration constitutes such a gift. The following are examples of these decisions: 1. Delivery of certificate without endorsement and without assignment. *Leyson* v. *Davis*, 17 Mont. 220 (*supra*); *Commonwealth* v. *Crompton*, 137 Pa. St. 138; *Bank* v. *Holland*, 99 Va. 495 (*supra*); *Bond* v. *Bean*, 72 N. H. 444; *Denunzio's Receiver* v. *Scholtz*, 117 Ky. 182; *Curtis* v. *Crossley*, 59 N. J. Eq. 358; *Brown* v. *Crafts*, 98 Me. 40, 44, 45

(*supra*); *Gilkinson* v. *Third Ave. R. R. Co.*, 47 N. Y. App. Div.
472 (*supra*); *Reed* v. *Copeland*, 50 Conn. 472.   2. Delivery of
certificate with assignment.   *Larimer* v. *Beardsley*, 130 Ia.
706, 709 (*supra*); *Stone* v. *Hackett*, 12 Gray. (Mass.) 227 (*supra*);
*Masury* v. *Arkansas Nat. Bank*, 93 Fed. Rep. 603.   3. Delivery
of assignment without delivery of certificate.   *Grymes* v.
*Hone*, 49 N. Y. 17; *Curtis* v. *Crossley*, 59 N. J. Eq. 358, 362;
Lowell, Transfer of Stock, 44.   And see *Hani* v. *Germania L.
Ins. Co.*, 197 Pa. St. 276, 279; *Bond* v. *Bunting*, 78 Pa. St. 210;
*Candee* v. *Conn. Savings Bank*, 81 Conn. 372 (*supra*); *Otis* v.
*Beckwith*, 49 Ill. 121; *Cowen* v. *National Bank*, 94 Tex. 547;
*Elam* v. *Keen*; 4 Leigh (Va.) 358.

The principle underlying these decisions is that the delivery
of the certificates or assignments makes the donee substan-
tially *dominus* of the shares, since he needs no further assist-
ance from the donor and can compel registration by the corpora-
tion.   Such delivery is all that is required to pass an ownership
or equitable title to the donee, and in enforcing such title,
equity is not aiding a volunteer to perfect an imperfect title,
but is enforcing this title, which the donor by his delivery has
already perfected.   The donor is still the legal owner of the
shares, since they stand in his name on the books of the cor-
poration.   As in the case of any other non-negotiable chose in
action, this legal title can only pass by the recognition by the
debtor of the transferee, *i. e.* by novation.   The beneficial or
equitable title, however, in each such case may be assigned
without novation, and will be enforced regardless of the
requirement of registration on the books of the corporation.
Such requirement is solely for the benefit of the corporation
and has nothing to do with the transfer of the equitable title.
The transfer on the books is in reality nothing but a novation.
In *Commonwealth* v. *Crompton*, 137 Pa. St. 138, 148, (*supra*),
this principle is thus expressed: "The shares of stock are
choses in action, and the certificates evidence of the title to
them: *Slaymaker* v. *Bank*, 10 Pa. 373.   Why may not a de-
livery of the certificates, coupled with words of absolute and
present gift, invest the donee with an equitable title to the
stock which the donor or a volunteer cannot successfully assail?

A stockholder may clothe another with the complete equitable title to his stock without compliance with the forms printed by the corporation."

In *Bank* v. *Holland*, 99 Va. 495, 501 (*supra*), it is said: "It is well settled by the modern authorities that choses in action not negotiable, and negotiable paper not endorsed, may be the subject of a gift, and that a delivery which vests in the donee the equitable title is sufficient without a complete transfer of the legal title. The delivery therefore of a certificate of stock, unendorsed, by the donor to the donee with intent to transfer title by way of gift, is effectual as an equitable assignment, although no legal title passes for want of an endorsement and transfer on the books of the bank." . . . "We hold, therefore, that it was not indispensable to the validity of the transfer of the stock in question that there should have been any endorsement on the certificate, or transfer on the books of the bank; that the delivery of the certificate, without endorsement by John W. Holland to his wife with intent to give her the stock, vested in Mrs. Holland the complete equitable title, and divested her husband of all present control and dominion over the same."

In *Larimer* v. *Beardsley*, 130 Ia. 706, 709 (*supra*), the court said: "It is suggested in argument that the certificate could be transferred only on the books of the bank, but this is true only with reference to the question as to who was a stockholder in the bank. See Rev. St. U. S. Section 315 (U. S. Comp. St. 1901, p. 2054). Certainly there is no question as to the right of the owner of shares of stock in a national bank to transfer a legal or equitable right to such shares, although they remain in his name on the books of the bank."

In *Bond* v. *Bean*, 72 N. H. 444, 446 (*supra*), the court said: "The delivery of the stock with an intent to make a completed gift and its acceptance by the donee, vested in her the equitable title to the property. The fact that the certificate was not endorsed did not render the gift incomplete as a matter of law."

In *McNeil* v. *Tenth Nat. Bank*, 46 N. Y. 325, the court said: "Such by-laws do not incapacitate the shareholder from parting with his interest."

In *Stone* v. *Hackett*, 12 Gray, 227, 231, where there was no transfer of shares of railroad stock on the books of the corporation, but certificates handed over to trustee, with endorsement in blank, the court says, at p. 231: "The conveyance or transfer of the shares to the plaintiff in her capacity as trustee was full and complete and vested in her the legal title to the property. No further act was to be done by the original owner of the shares to consummate the plaintiff's title. As between the parties, the delivery of the certificates of stock, with the assignments of some of them and the power of attorney to transfer the others, was equivalent to a complete executed transfer of the shares. Nor is it at all material to the validity of the plaintiff's title, that transfers of the shares had not been recorded in the books of the different corporations and new certificates of stock taken out by her. That was not necessary to the conveyance of the legal title as between the donor and the plaintiff. This is well settled by the authorities in this state. *Quiner* v. *Marblehead Social Ins. Co.,* 10 Mass. 476; *Ellis* v. *Essex Merrimack Bridge,* 2 Pick. 248; *Sargent* v. *Franklin Ins. Co.,* 8 Pick. 96; *Eames* v. *Wheeler,* 19 Pick. 444."

In Thompson, Corporations (1st ed.) § 2390, the author says: " . . . It has been often held that a valid gift of *non-negotiable securities* may be made by the delivery of them to the donee, without an assignment or indorsement in writing. This principle has been applied to notes, bonds, stocks, certificates of deposit, and life insurance policies. Shares of stock, as elsewhere seen, are regarded for many purposes as *choses in action,* and the certificates as evidence of the title of the holder to them. It has therefore been held that a stockholder may clothe another with a complete equitable title to his shares by a *delivery* to him *of the share certificate,* without a compliance with the forms required by the corporation for a transfer of the shares."

In Morawetz, Private Corporations (2d ed.) § 197, it is said: "There is no inconsistency between a law requiring transfers to be executed on the stock-books, and a custom by which assignments of shares are made by indorsement and

delivery of the certificates. A transfer of shares means a complete substitution of shareholders, and novation of the contract of membership, as against the corporation, as well as the parties to the transfer; an assignment means a transfer of the equitable ownership, together with a right to obtain a complete transfer upon complying with the forms prescribed by the charter. To hold that a provision requiring all transfers to be. executed on the books implies a prohibition against assignments by delivery of the certificates, is to place a strained and unnecessary construction upon the statute, in order to reach a very undesirable result."

The courts of this State have recognized the principle that although a transfer on the books of the corporation may be necessary to create a legal title, an equitable title may be created without such transfer. *Lockwood* v. *Mechanics' Nat. Bank,* 9 R.I. 308, 331; *Lippitt* v. *American, etc., Co.,* 15 R. I. 141. In England equitable assignments formerly were not recognized. Consequently, in the early cases, a gift of the evidence representing non-negotiable choses in action failed for want of legal delivery. The later cases, however, have gradually adopted the modern doctrine above stated. *Duffield* v. *Hicks,* 1 Dow. & Cl. 1; *Re Patrick* (1891), 1 Ch. 82. See *Leyson* v. *Davis,* 17 Mont. 220, 281. The modern doctrine has not been applied in England, however, to certificates of stock. *Milroy* v. *Lord,* 4 DeG., F. & J., 264. See Pom. Eq. Jur. (3d ed.), § 1148 note.

It has been very conclusively shown by the foregoing discussion that, while the general doctrine of *Milroy* v. *Lord,* (*supra*), has been recognized and approved, both in this State and elsewhere, the courts of this country have universally refused to follow its extreme application as applied to gifts or trusts of corporate stocks. The injustice, as well as the absurdity of a doctrine refusing to recognize a gift of unindorsed certificate of stock is well pointed out by Dean Ames in his Cases on Trusts: "Even in jurisdictions where the gift is ineffectual unless the shares, or deposit, are transferred on the books of the company or savings bank, the donor would not be allowed to recover the certificate or bank-book after he had once

delivered them with the intention of vesting them in the donee. We should have, then, this extraordinary condition of things; the donee unable to transfer the shares or collect the deposit, because the gift is not deemed complete; the donor equally helpless because he cannot produce the certificate or bank-book; the company or bank, on the other hand, in a position capriciously to recognize either the donor or the donee as *dominus* of the claim, or, indeed, unless they come to some compromise, to refuse with safety to recognize either." 1 Ames, Cases on Trusts (2d ed.), 156 note; 12 Harv. L. Rev., 498, 499; see also *Duffield* v. *Hicks*, 1 Dow. & Cl. 1.

In view of our conclusions that the settlor in this case created complete trusts *in præsenti* when he delivered the trust assignments and certificates of stock to Martha Talbot as trustee, the final contention of the complainant's counsel, that circumstances indicated a purpose on the part of the settlor to make a testamentary disposition of the stocks, is clearly untenable. The conveyance of the stocks was none the less present because of the fact that one of the evident purposes of the trust was to secure a distribution of the property after the grantor's death. Thus in *Stone* v. *Hackett* (*supra*), 12 Gray, 227, 231, it is said: "Nor are we able to see any force in the suggestion that the trust which the donor created in some of its features looked to a disposition of the property which was the subject of the gift after his death. We know of no principle of law which renders such a transfer of property *inter vivos* invalid." When, after Frederic Talbot's death, the trustees, having then all of them come into possession of the trust assignments and stock certificates, proceeded to present the same to the Gorham Manufacturing Company and the Silversmiths Company, and to demand and receive new certificates for said stocks in their own names as trustees, they did what it was their undoubted right and duty to do, and simply exercised the powers and duties conferred and imposed upon them by the settlor. The settlor had done all that was incumbent upon him to transfer the ownership of the stocks, and the trustees, by the issue of the new certificates to them, by the corporations, became then, as between

themselves and the corporations, lawful stockholders therein, capable of exercising all the rights of stockholders by way of voting and receipt of dividends.

In our opinion, in answer to the questions propounded by the bill, the five assignments in trust are valid, the trusts therein were and are fully constituted, and said trustees should hold said stock certificates under the trusts of the said instruments.

A decree in accordance herewith may be presented for approval.

*Herbert A. Rice*, for complainants.

*Edwards & Angell, Royal H. Gladding, James C. Collins*, for respondents.

*Eugene A. Kingman*, of counsel.