## ADAMS v. HAGEROTT.

Circuit Court of Appeals, Eighth Circuit.
September 18, 1929.

No. 8395.

R. G. Dodge, of Boston, Mass. (Harold S. Davis, of Boston, Mass., and Alfred Zuger and B. F. Tillotson, both of Bismarck, N. D., on the brief), for appellant.

George W. Thorp, of Fargo, N. D. (Burton S. Wilcox, of Center, N. D., A. G. Divet, of Los Angeles, Cal., and William H. Shure, and Francis Murphy, both of Fargo, N. D., on the brief), for appellee.

Before BOOTH, Circuit Judge, and SANBORN and DEWEY, District Judges.

BOOTH, Circuit Judge. This is a bill in equity in which the appellant, plaintiff below, seeks to be adjudged owner as trustee of certain certificates of stock found among the property of A. D. Gaines, deceased, and prays that the administrator of said estate be directed to turn the certificates over to him. The bill was dismissed by the trial court for want of equity.

Facts appeared in evidence as follows: A. D. Gaines, during the last 47 years of his life, lived in North Dakota and acquired property there of the estimated value of several hundred thousand dollars. He died July 9, 1927, leaving a widow and son. He was a native of Vermont, and had relatives there whom he visited from time to time. He also had a nephew, appellant herein, who was the son of a sister, and who had been since 1906 engaged in work of the Young Men's Christian Association. Since 1920 Mr. Adams has been general secretary of the Association, and has lived in Boston. As early as 1917, Mr. Gaines had stated to D. T. Owens, one of his business friends in North Dakota, that he intended to leave a substantial sum to Mr. Adams and to the Young Men's Christian Association. In the winter of 1919–1920 Mr. Gaines was troubled both on

account of fear that certain land operators would get judgment against him and take away some of his property, and also because of apprehension that his wife might get a divorce and obtain a considerable portion of his property. Amongst other property Mr. Gaines owned stock in the Northern States Power Company, in the Russell Grader Manufacturing Company, and in the Boyd Transfer & Storage Company. In the early winter of 1919–1920 Mr. Gaines had a talk with Mr. Wold, an officer of the Russell Grader Manufacturing Company, at Minneapolis. He told Mr. Wold of his troubles and that he desired to protect his property on account of his boy, and that he wanted to place a certain amount of the Russell Grader stock in Mr. Wold's name to be held, the dividends to be paid to Mr. Gaines. Mr. Wold refused to carry out the suggestion, and Mr. Gaines said he had a nephew that he could probably use for that purpose. A somewhat similar talk was had by Mr. Gaines with H. H. Chamberlain, president of the Boyd Transfer & Storage Company. Mr. Gaines went to Newport, Vt., reaching there before January 1, 1920. He remained there until March 17, 1920, except that he visited Boston. Mr. Gaines told his sister, Mrs. Davis, at whose home he was visiting, that he wished to put part of his property out of the reach of his wife and of the land operators with whom he was having trouble, so that he would have something to take care of him when he was old; that he was arranging to have $75,000 go to the Boston Y. M. C. A. and the income of this amount was to be paid to him during his life and then to the plaintiff during his life and then was to go to the Boston Y. M. C. A.; that he thought the Y. M. C. A. was a wonderful institution and did a great amount of good in the world and that he was glad to have a nephew engaged in that work; this was spoken of more than once. His relations with the plaintiff were of the closest; he was very fond of him and seemed to depend upon him a great deal. Early in February, 1920, Mr. Gaines owned, among other securities, 100 shares of preferred stock of the Boyd Transfer & Storage Company, 250 shares of preferred stock of the Russell Grader Manufacturing Company, and 250 shares of preferred stock of the Northern States Power Company. He caused the stock mentioned to be transferred to the plaintiff, W. E. Adams, on the books of the respective companies, and certificates to be issued in the plaintiff's name. He also subscribed for 150 additional shares of preferred stock of the Boyd Transfer & Storage Company; these shares were paid for in three installments of $5,000 each; the certificates being issued in the plaintiff's name. In the company's cash book there appears under date of February 13, 1920, the entry, "W. E. Adams, by A. D. Gaines, $5,000"; under date of February 17, 1920, there appears the entry, "W. E. Adams, by A. D. Gaines, trustee, $5,000"; under date of February 24, 1920, there appears the entry, "W. E. Adams, by A. D. Gaines (Trustee) $5,000." All the 750 shares thus placed in the plaintiff's name continued to stand in that name up to the time of Mr. Gaines' death. After the transfers, there remained other stock—both common and preferred—of the Russell Grader Manufacturing Company in Mr. Gaines' name; also stock of the Boyd Transfer & Storage Company in his name, both as an individual and as guardian for his son, Alvin B. Gaines. On March 14, 1920, Mr. Adams went to Newport, Vt., at the request of Mr. Gaines, who was still visiting there at the home of his sister, Mrs. Davis.

The several stock certificates in controversy (covering 250 shares, $100 par value, Northern States Power Company; 250 shares, $100 par value, Russell Grader Manufacturing Company; 250 shares, $100 par value, Boyd Transfer & Storage Company) were offered in evidence and showed that they were issued in the name of W. E. Adams, and assigned to A. D. Gaines under date March 15, 1920. The value of this stock was about $75,000.

In addition to the foregoing facts, Charles F. Davis, husband of Mrs. Davis, testified: "I recall a talk with Mr. Gaines during the winter of 1920 with reference to some disposition of part of his property. I recall an occasion in our house when I saw certain stock certificates in his possession. From my wife's diary this was the 16th of March. I could not have given the exact date without that, but it was right around there. I looked at the stock certificates and saw that they were in three different companies, the Russell Grader Manufacturing Company, the Boyd Transfer & Storage Company, and the Northern States Power Company. I had a conversation with Mr. Gaines as to what he was doing with those stock certificates. He said he was having them transferred—they were to be transferred to the Boston Y. M. C. A. eventually. I do not think they were directly; that is, I do not think they were assigned over directly to the Boston Y. M. C. A. Mr. Gaines said he was giving them to the Boston Y. M. C. A., but they were to

be fixed so that he was to have the income of them during his life and the plaintiff was to have the income after he died as long as he lived; then they were to go to the Boston Y. M. C. A. Mr. Gaines said that these stock certificates represented $75,000—$25,000 in each of those companies.

"I could not say that I talked with Mr. Gaines directly about that matter at any subsequent time, but from his conversation at different times I think I knew his motive.

"Q. I am only asking for what he said to you either then or on any other occasion as to his motive. If he said anything to you at any time, I would be glad to have you tell us. A. Well, I knew there was a double motive. I do not know whether he told me directly that way; he was placing this amount of his property where he was sure that he would be getting the income from it. It could not be got away from him in that way and he was very much interested in Y. M. C. A. work and he thought that was a good way to place it, so that he would have it as long as he had any use for it and then it would go to a good cause. I have heard him a good many times express a fear that his wife or these western land people might get all of his property or part of it away from him. He said he was having this trouble with his wife and did not know how much she would get or would try to get; he was trying to make provision for himself in case she should win her case—I suppose divorce case. I should say that the divorce case was disposed of within a year or two after this incident, but I would not attempt to be very near it."

John H. Gaines, a brother of A. D. Gaines, testified:

"He told me that he was placing with young Adams for the Young Men's Christian Association in Boston the sum of $75,-000.00; that he was to have the income of that money during his life; at his death that young Adams was to have the income of that money to do as he saw fit. He went on to state that he had a feeling that he was a very fair man and that if anything should turn up that there was any obligation that stood against him in a way that Will might take care of it that he felt sure that he would do so, but that Will was to have that money to spend as his own.

"Q. You mean the principal or income? A. The income on the $75,000.00 was to become his property and at his death the amount of $75,000.00 was to become the property of the Young Men's Christian As-sociation of Boston or the Boston Young Men's Christian Association.

"Q. Had your brother at any time before that spoken to you about the work of the Y. M. C. A.? A. He had; he had spoken to me at various times and seemed very much interested, especially after young Adams became interested in the work.

"Q. Had he ever talked to you about his relations with Wilman Adams? A. He had."

In December, 1920, a document in the form of a letter was signed by A. D. Gaines and left with Mr. Adams. The making of the letter is thus described by a witness, Edith P. Jewett:

"The document was dictated to me in the plaintiff's private office in the Y. M. C. A. in Boston by A. D. Gaines. The plaintiff was present. I recollect perfectly where Mr. Gaines sat in that office and recall his appearance. I cannot tell the exact date when Mr. Gaines dictated the document but can fix the months from my records as December, 1920. Mr. Gaines was stopping at the Y. M. C. A. at the time when he dictated it. After taking the dictation I read back from my notes to Mr. Gaines and immediately thereafter wrote out the document. I then took it to the plaintiff's office and left it there."

Several witnesses testified relative to sub-sequent conversations had with A. D. Gaines. Mrs. Davis testified:

"In the spring of 1924, I had a further talk with Mr. Gaines as to this same matter. We were then living in Bradenton, Florida, and he was with us there for several months. I asked him at one time if he had arranged his matters so that his property would go as he wished when he was through with it and then I said 'It seems as though you ought to do a great amount of good with your money.' He said 'I have already given to the Y. M. C. A. $75,000 and I am going to give a schol-arship to Dartmouth College.' He did not tell me anything further about it, and that was the only talk I ever had with him about it.

"Q. Did he mention Wilman in that con-nection? A. Why he told me how he had given it; and, of course, he knew that I knew all about it.

"He said he had already given $75,000 at Wilman's death of course, to the Boston Y. M. C. A. and that he was going to give a scholarship to Dartmouth College. He did not at that time say anything about the amount of his property."

John H. Gaines testified that in 1926 A.

D. Gaines said to him: " 'I have taken care of Will. He will have the use of $100,000. I have willed him $25,000 and I have left $75,000 that he is to have the income of during the rest of his life and at his death this $75,000 is to become the property of the Y. M. C. A. of Boston.' "

And again:

" 'I have got this matter fixed so it cannot miscarry. This money has got to land finally as the property of the Y. M. C. A. of Boston and during that time Will has the income on $100,000.' "

"He said that he was to have the income of $75,000 himself during the period of his life and at his death the plaintiff was to have the income of the $75,000 and then at his death it was to become the property of the Y. M. C. A. of Boston."

The document of December, 1920, mentioned above, is as follows:

"Newport, Vermont, March 15, 1920.

"Mr. Wilman E. Adams, 316 Huntington Avenue, Boston, Massachusetts. My Dear Nephew: According to the verbal understanding reached between us some time ago, I hereby convey to you as trustee the title to the following stocks:

"250 shares 7% preferred stock $100 par value Northern States Power Company.

"250 shares 8% preferred stock $100 par value Russell Grader Manufacturing Company.

"250 shares 8% preferred stock $100 par value Boyd Transfer and Storage Company.

"All of the above stocks have been transferred to your name on the books of said Companies.

"This transfer of title is made under the following conditions:

"First: That during the remainder of my lifetime the total income from said stocks is to be paid to me.

"Second: That from the time of my death and during the remainder of your lifetime the total income from said stocks shall be used for any purpose you may see fit.

"Third: That should your death take place before mine, the President of the Boston Young Men's Christian Association shall become Trustee of this fund to fulfill all conditions named in this agreement.

"Fourth: That at the time of your death these stocks shall become the property of the Boston Young Men's Christian Association and become a part of the Permanent Endowment Fund of that organization.

"Fifth: That after my death you are to have authority to sell any or all of these stocks and invest the proceeds of the sale in such other securities as your best judgment shall direct when such sale and re-investment shall seem necessary.

"I have complete confidence that you will carry out the understanding reached between us in every particular.

"As ever, your uncle,

"A. D. Gaines."

There was no testimony explaining why the document, though made in December, 1920, was dated back March 15, 1920.

It also appeared from the evidence that the dividends on the stock from March, 1920, until the death of A. D. Gaines were transmitted to W. E. Adams; that the dividend checks were indorsed by him personally or by Charles F. Davis through a power of attorney and sent to A. D. Gaines.

It further appeared that Mr. Gaines' troubles with his wife came to an end in May, 1921, by a decree of divorce and money settlement; and the witness Owens testified that so far as he knew Mr. Gaines had no troubles with land operators after 1920.

Several questions relating to the jurisdiction of the court were raised by defendant's answer. They have not been argued to this court by the appellee; and, inasmuch as none of them challenges the jurisdiction of the court as a federal court, we pretermit any discussion of them, but consider them waived.

Two questions arise on this appeal: 1. Was it the intention of A. D. Gaines on March 15, 1920, to make a present gift in trust of the stock in controversy to W. E. Adams? 2. Was sufficient said and done by A. D. Gaines to create a gift in trust in W. E. Adams? The first is a question of fact; the second a question of law.

Bearing upon the first question the evidence shows: (a) The repeated statements by Mr. Gaines that he intended to make W. E. Adams and the Y. M. C. A. at Boston recipients of his bounty; these statements began as early as 1917; (b) the placing by Mr. Gaines of the certificates of stock in controversy in the name of W. E. Adams on the books of the respective corporations; (c) the delivery by Mr. Gaines of the stock certificates to Mr. Adams at Newport, Vt., on March 15, 1920; (d) the subsequent repeated statements of Mr. Gaines to several of his relatives, as late as 1926, that he had made a gift of the stock to Mr. Adams for life, remainder to the Y. M. C. A., with a reservation to himself of the income during his life; (e) the making and delivery by Mr.

Gaines to Mr. Adams in December, 1920, of the document dated March 15, 1920, setting forth specifically the terms of the alleged trust; (f) the collection by Mr. Adams of the dividends on the stock from March, 1920, to the time of the death of Mr. Gaines in 1927, and the payment of such dividends to Mr. Gaines.

On the other hand the evidence shows (a) that Mr. Gaines in 1920 had motives for placing the certificates of stock in some name other than his own quite apart from any motive of making a gift in trust; (b) that directly after the certificates were delivered to Mr. Adams on March 15, 1920, they were indorsed by him to Mr. Gaines and delivered back to him, and that they remained in Mr. Gaines' possession until his death. But the evidence does not disclose that Mr. Gaines made any use of the certificates of stock thus placed in his possession.

From this statement of facts it is possible to draw different conclusions as to the ultimate fact of intention on the part of Mr. Gaines. Several obscure points would doubtless be cleared up could we have the testimony of the two parties directly involved in the transaction of March 15, 1920. But the lips of Mr. Gaines were sealed by death, and the lips of Mr. Adams are sealed by the statute of North Dakota (Comp. Laws 1913, § 7871).

The statements made by Mr. Gaines prior to March 15, 1920, were howeyer, admissible as showing intent, and his subsequent statements were admissible as showing his interpretation of what had been done. Talbot v. Talbot, 32 R. I. 72, 90, 78 A. 535, Ann. Cas. 1912C, 1221; Supple v. Suffolk Sav. Bank, 198 Mass. 393, 397, 84 N. E. 432, 126 Am. St. Rep. 451.

The fact that Mr. Gaines had another motive for placing the stock in the name of Mr. Adams is not fatal to a gift in trust. Von Hesse v. MacKaye, 136 N. Y. 114, 32 N. E. 615.

The documentary letter written by Mr. Gaines in December, 1920, but dated back to March 15, 1920, is of importance as showing Mr. Gaines' interpretation of the transactions of March 15, 1920; as showing the details of the gift in trust, and as showing that Mr. Gaines did not regard the indorsement and delivery back to him of the certificates as in any way a denial of his intention to create the gift in trust, or a denial of delivery to Mr. Adams for that purpose on March 15, 1920. The trust was already in operation in December, 1920, and Mr.

Gaines recognized it by signing and delivering the documentary letter of that date.

While the answer to the first question, viz. as to the intention of Mr. Gaines, may not be free from doubt, yet, after careful consideration of the evidence, we have reached the conclusion that it must be answered in the affirmative. An opposite conclusion would involve holding that Mr. Gaines' action in placing the stock in the name of Mr. Adams, his declarations to his relatives, his action in signing and delivering the document of December, 1920, were all a sham; would involve holding that Mr. Gaines expected that Mr. Adams would testify falsely as to the real beneficial ownership of the stock if the creditors of Mr. Gaines should ever call in question the transaction of March 15, 1920. We decline to make such holdings upon the present record.

We turn to the second question. The requirements necessary to constitute a valid gift inter vivos have given rise to much litigation, and there is not complete harmony in the decisions of different jurisdictions. Some of the essential elements are, however, beyond dispute, whether the gift be absolute or in trust.

Pomeroy in his work on Equity Jurisprudence (3d Ed.) § 998, says: "If the donor makes a complete conveyance of real property or assignment of personal property sufficient to vest the legal title in the donee; or if he completely conveys or assigns the property to a trustee upon trusts effectually created on behalf of the donee; * * * then, in each of these instances, the gift is valid although voluntary; the donee's rights are perfect, and equity will enforce them against the donor, and all persons claiming under him as volunteers."

In Perry on Trusts (6th Ed.) § 100, it is said: "If the donor or settlor propose to make a stranger the trustee of his property, and the property is a legal estate capable of legal transfer and delivery, the trust is not perfectly created, unless the legal interest is actually transferred to or vested in the trustee. It is not enough that the settlor executed a paper purporting to pass it, if in fact the paper does not have that effect. The intention of the settlor to divest himself of the legal title must be consummated and executed, or the court will not enforce the trust."

Speaking of the delivery necessary to complete a gift, this court has said in Allen-West Comm. Co. v. Grumbles, 129 F. 287, 290:

"This delivery must be an actual one 'so far as the subject is capable of it. It must be secundum subjectam materiam, and be the true and effectual way of obtaining the command and dominion of the subject.' 2 Kent's Com. 439. If the subject of the gift is a chose in action, such as a bond, a note, or stock in a corporation, the delivery of the most effectual means of reducing the chose to possession or use, such as the delivery of the bond, or the note, or the certificate of stock, if present and capable of delivery, is indispensable to the completion of the gift." To the same effect see Ratterman v. Lodge, 13 F.(2d) 805 (C. C. A. 8).

It is plain from the evidence that these requirements were met in the case at bar. The certificates of stock had been placed in the name of W. E. Adams on the books of the corporations; new certificates in his name had been issued; manual delivery of these new certificates was made by Mr. Gaines to Mr. Adams on March 15, 1920. The fact that Mr. Gaines was to have the dividends during his life would not defeat the gift in trust. Stone v. Hackett, 12 Gray (Mass) 227; Talbot v. Talbot, supra; Tileston v. Tileston, 234 Mass. 530, 125 N. E. 555; Shepard v. Shepard, 164 Mich. 183, 129 N. W. 201; Bingham v. White (D. C.) 31 F.(2d) 574; Ratterman v. Lodge, supra.

But it is contended that there was no real delivery of the certificates to Mr. Adams on that date, because on the same day Mr. Adams indorsed the certificates to Mr. Gaines and redelivered them to him. We have already held that Mr. Gaines had the intention on March 15, 1920, of creating a trust in W. E. Adams. That this intention was not abrogated at once or at all is shown by the subsequent declarations of Mr. Gaines, and by the making by him of the document of December, 1920. But was it possible for the trust to continue even though the intention was not changed, in view of the indorsement and redelivery of the certificates of stock to Mr. Gaines? We think it was. The trust once created was irrevocable unless the donor at its creation reserved such power. Eschen v. Steers, 10 F.(2d) 739 (C. C. A. 8); Beaumont v. Beaumont (C. C. A.) 152 F. 55. There is no evidence that Mr. Gaines reserved such power, unless it be the fact that the certificates were indorsed and redelivered to him; and that fact does not necessarily imply a reservation of the power of revocation. It is capable of other interpretation. It might mean simply that Mr. Gaines, with the consent of Mr. Adams, took that means of insuring to himself the receipt of the dividends during his life. It might mean that Mr. Gaines, with the consent of Mr. Adams, took that means of rendering himself able to make changes in the stock investment if that became necessary or advisable. The reservation of such power and possession, being for a special purpose, would not necessarily be fatal to the gift in trust. Tileston v. Tileston, supra; Von Hesse v. MacKaye, supra; Jones v. Old Colony Tr. Co., 251 Mass. 309, 146 N. E. 716; Roberts' Appeal, 85 Pa. 84; Larimer v. Beardsley, 130 Iowa, 706, 107 N. W. 935; Martin v. Martin, 170 Ill. 18, 48 N. E. 694; Garrison v. Union Tr. Co., 164 Mich. 345, 129 N. W. 691, 32 L. R. A. (N. S.) 219, and note; McDonald v. Larson, 142 Minn. 244, 171 N. W. 811; McNally v. McAndrew, 98 Wis. 62, 73 N. W. 315; Bingham v. White, supra.

Even if the indorsement of the certificates and redelivery to Mr. Gaines could be construed as indicating the reservation of a power to revoke, yet, the evidence is conclusive that the power was not exercised, but the trust was carried out for about seven years. The mere existence of a power to revoke is not fatal to a gift in trust. Jones v. Clifton, 101 U. S. 225, 229, 25 L. Ed. 908; Jones v. Old Colony Trust Co., supra; Stone v. Hackett, supra; Von Hesse v. MacKaye, supra.

We think what was done and said by Mr. Gaines prior to and on March 15, 1920, was sufficient to create a valid gift in trust to W. E. Adams of the certificates of stock in controversy; and the second question is accordingly answered in the affirmative.

Our conclusion of the whole case is that the plaintiff as trustee is the owner of the certificates of the stock in controversy, and is entitled to recover possession thereof, together with accrued dividends, from the defendant.

Decree is accordingly reversed, with instructions to enter decree for plaintiff.